**Elmer PRATT, Plaintiff,**

v.

**James ROWLAND, Director of Corrections, California Department of Corrections; James H. Gomez, Current Director of Corrections, California Department of Corrections; Daniel B. Vasquez, Warden of San Quentin Prison; Robert Borg, Warden of Folsom Prison; B.J. Bunnell, Warden of Tehachapi Prison; Les Blanks, Program Administrator Tehachapi Prison; G. Crowell, Correctional Lieutenant, Tehachapi Prison; Terry Yearwood, Chief of Classification Services, California Department of Corrections; and K. Law, Correctional Officer, Tehachapi Prison; Lieutenant Crow, Correctional Officer, Tehachapi Prison; and Kim Walker, Correctional Counselor, Tehachapi Prison, Defendants.**

**No. C–89–3367 SAW.**

United States District Court, N.D. California.

June 27, 1994.

---

**5.** *See, e.g., In re Syntex Corp. Securities Litigation,* Fed.Sec.L.Rep. (CCH) ¶ 97,747, at 97,568, 1993 WL 476646 (N.D.Cal.1993).

Stuart Hanlon, Tamburello, Hanlon & Waggener, San Francisco, CA, Valerie West, Oakland, CA, for plaintiff.

Paul Gifford, Peter Siggins, California State Atty. General's Office, San Francisco, CA, for defendants.

## MEMORANDUM AND ORDER

WEIGEL, District Judge.

Elmer "Geronimo" Pratt ("Plaintiff") applies for a Preliminary Injunction claiming that defendants have unlawfully retaliated against Plaintiff by moving him to Mule Creek State Prison, located in Amador County, and forcing him to occupy a double cell. Plaintiff also claims that in light of his medical condition, requiring him to occupy a double cell violates the Eighth Amendment proscription against cruel and unusual punishment.[1] On February 24, 1994, this Court granted Plaintiff's Application for a Temporary Restraining Order requiring Defendants to return Plaintiff to single-cell status at a Level III security prison in California.

■ Before evaluating the legal rights of the parties, it must be understood that the prison authorities, not the courts, should administer the prisons. The prison authorities have extremely difficult and important tasks in protecting the public against criminals who have been found guilty of violations of law and, in many cases, of violent conduct injuring innocent citizens. Therefore legal claims made by prisoners against prison authorities should be examined with the greatest care. And even if a prisoner is lawfully entitled to protection of a claimed right, courts should limit relief to that least interfering with prison management by the prison authorities. These standards govern the decision of this Court in this case.

## I. BACKGROUND.

Plaintiff, a former leader of the Black Panther Party, was convicted of murder in 1972 and is now serving a life term in the California state prison system.

On September 12, 1989, Plaintiff filed a civil rights action in this Court under 42 U.S.C. § 1983, naming various prison officials as defendants. Plaintiff claimed, *inter alia*, that he was transferred from the California State Prison at San Quentin to the California State Prison at Folsom in retaliation (1) for testifying about the FBI's counter-intelligence program against the Black Panther Party, in retaliation (2) for drawing media attention to Plaintiff's claims of innocence, and in retaliation (3) for a successful civil rights action brought by Plaintiff in 1981.[2] Plaintiff's transfer to Folsom occurred one day after he returned from testifying about the FBI in a federal trial in Puerto Rico. On September 28, 1989, the Court issued a Preliminary Injunction ordering Plaintiff returned from Folsom to San Quentin.

On August 9, 1991, 770 F.Supp. 1399, the Court denied Plaintiff's motion for a Preliminary Injunction requiring defendants to release Plaintiff from administrative confinement to the general prison population at Tehachapi.[3] However, in its Memorandum and Order, the Court expressed concern as to the possibility that Defendants had harassed Plaintiff because of his prominence and active pursuit of legal action. The Court observed that Plaintiff's declarations contained allegations that were "too serious, detailed, and numerous to dismiss."[4] Order of August 9, 1991, at 1406. In light of these allegations, and the two earlier judicial findings of actual or probable retaliation against Plaintiff,[5] the Court issued the following Preliminary Injunction:

---

1. Plaintiff does not challenge the constitutionality of general prison conditions. His claims are limited to his individual treatment.

2. In 1981, a jury found that Plaintiff had been unlawfully placed in solitary confinement for retaliatory reasons. *Pratt v. Rees*, C-76-1069-SC. Plaintiff was consequently released to the general prison population.

3. The Court's decision rested on its limited authority to review an administrative hearing officer's findings.

4. Among other things, Plaintiff charged that prison authorities framed him for marijuana possession in 1989 at a time when he had no access to the property purportedly containing the marijuana (this charge was later dropped "in the interests of justice"); that prison authorities regularly mutilated his personal and legal mail; and that he was disciplined for a refusal to work in February 1991 on a day when he had been issued a sick lay-in.

5. The 1981 jury verdict was based on a finding of retaliation, and the 1989 Preliminary Injunction was based on probable retaliation.

"IT IS FURTHER ORDERED that defendants, their officers, servants, employees, and all persons acting in concert or participation with them are enjoined and restrained from threatening plaintiff with punishment, penalty, or other reprisals; harassing plaintiff; or imposing punishment, penalty, or other reprisals because of plaintiff's exercise of his rights under the First Amendment or his pursuit of legal remedies or his political beliefs or his media attention." Order of August 9, 1991, at 1406.

On August 12, 1993, Plaintiff was transferred from the California Correctional Institution at Tehachapi to the R.J. Donovan Correctional Facility ("Donovan") to participate in a ninety-day psychiatric diagnostic program as directed by the Board of Prison Terms. On December 1, 1993, after Plaintiff had completed the program, Donovan's warden recommended that he be returned to Tehachapi.

On December 17, 1993, staff at KTTV, the Fox network affiliate in Los Angeles, requested an interview with Plaintiff. Plaintiff declined.[6] On December 21, 1993, Plaintiff changed his mind, and on December 22, 1993, Lt. Marion Daniels, a state Public Information Officer at Donovan, arranged the interview with KTTV.[7] On December 24, 1993, the Departmental Review Board ordered Plaintiff transferred to Mule Creek State Prison, a medium security facility in Amador County. The order was prompted by a direct communication from the Director of Corrections, Defendant James Gomez,[8] to move Plaintiff further north.[9]

On December 27, 1993, KTTV interviewed Plaintiff, and a three-part series on his case was aired on January 3, 4, and 5, 1994.[10] On January 7, 1994, Plaintiff was removed from Donovan, and on January 10, 1994, he arrived at Mule Creek. Plaintiff was placed in Administrative Segregation for three days. On January 13, 1994, he was called before an Initial Classification Committee. Although Plaintiff informed the Committee that he needed a single cell for medical reasons, the Committee apparently denied the request without inquiring into Plaintiff's medical history. *See* Mueller Depo. at 26–27.

Plaintiff has a history of nightmares, insomnia, and combat-related stress as a result of his experience in Vietnam. *See* Gruber Decl. Plaintiff also has a history of constipation, hemorrhoids, anal fissures, rectal bleeding and abdominal pain. *Id.* Plaintiff claims, and experts corroborate,[11] that these afflictions are aggravated when Plaintiff is double-celled.[12]

According to Plaintiff, prison officials have with few exceptions acknowledged and accommodated his psychological and physical need for a single cell.[13] Between 1972 and

---

**6.** Plaintiff claims he refused the request because he had been told by prison guards and other inmates to maintain a low profile if he wanted to remain at Donovan.

**7.** Initially, Lt. Daniels told KTTV that no new request could be submitted for ninety days. Daniels Depo. at 20. After receiving a call from one of Plaintiff's attorneys, Daniels apparently contacted CDC Associate Director Tip Kendell in Sacramento, who stated that no such ninety day rule existed. *Id.* at 21–23.

**8.** Cambra Depo. at 11; Valadez Depo. at 60. According to Valadez, "… when the director is involved in something … you just take care of business." *Id.* at 69.

**9.** According to Plaintiff, his greatest public support for his claims of innocence is in Southern California.

**10.** The series, entitled "A Case of Injustice?", reportedly presented new evidence that Plaintiff was initially incarcerated due to a frame-up by the Los Angeles Police Department and the FBI. The series exposed for the first time the identity of the likely perpetrators of the murder for which Plaintiff has already served 23 years.

**11.** *See* Decl. of Dr. David Levinson; Decl. of Dr. Paul Koller; and Decl. of Dr. Daniel Roth.

**12.** Plaintiff apparently suffers from frequent nightmares due to his Vietnam War experiences, particularly under the stress of living in a double cell. Also, Plaintiff apparently has rectal fissures from shrapnel wounds that cause him to develop rectal bleeding upon defecation when he occupies a double cell. The bleeding apparently results from the stress accompanying constipation caused by an inability to defecate in front of others.

**13.** Between 1972 and 1982, the Department of Corrections apparently did not require prisoners to share cells. Since 1978, Plaintiff has made Defendants aware of his need for a single cell.

1991, Plaintiff was placed in a double cell on a few occasions for a few days at a time. In 1991, he reportedly occupied a double cell for 20 days, and in 1992 for 3 to 4 months. Plaintiff was also confined in a double cell for a couple days after arriving at Donovan in August, 1993, and for a brief period in January and February, 1994, before this Court issued a Temporary Restraining Order. Otherwise, Plaintiff has spent his entire period of incarceration in a single cell.

## II. DISCUSSION.

### A. Standard for Granting Preliminary Injunction.

██ The standard for issuing a preliminary injunction is settled. The moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of the hardships tips sharply in his favor. *California Cedar Prods. Co. v. Pine Mountain Corp.*, 724 F.2d 827, 830 (9th Cir.1984).

### B. Likelihood of Success on the Merits

Plaintiff challenges his placement in a double cell on two grounds, *viz* unlawful retaliation and violation of his rights under the Eighth Amendment. He has shown probable success on at least one of these grounds.[14]

**1. Retaliation.** Plaintiff claims he was transferred to Mule Creek Prison and denied single-cell status in retaliation for exercising his first amendment rights.

██ This Court's August 9, 1991 Preliminary Injunction specifically enjoins James H. Gomez, Director of State Corrections, and his agents and employees from "imposing punishment, penalty, or other reprisals because of plaintiff's exercise of his rights under the First Amendment." Moreover, case law establishes that prison officials may not trans-

fer prisoners solely in retaliation for exercising their first amendment rights. *Meriwether v. Coughlin,* 879 F.2d 1037 (2d Cir.1989).

██ In order to state a first amendment claim under 42 U.S.C. § 1983, a prisoner must allege that official actions were retaliatory, and did not serve any legitimate correctional goal, or were not tailored narrowly enough to meet that goal. *Rizzo v. Dawson,* 778 F.2d 527, 532 (9th Cir.1985). An act in retaliation for the exercise of a constitutional right is actionable even if the act, when taken for a different reason, would have been proper. *Smith v. Maschner,* 899 F.2d 940, 948 (10th Cir.1990). Retaliatory motive may be proven through circumstantial evidence. *Id.* at 949.

██ As evidence of retaliatory motive, Plaintiff points to the timing and sequence of events, the irregular nature of the transfer procedure, Plaintiff's reception at Mule Creek, and the history of retaliation against Plaintiff. Defendants claim that their sole motivation was to do Plaintiff a favor by placing him closer to his family and allowing him to reside in a medium security facility.

#### a. Timing and Sequence of Events.

On December 22, 1993, Plaintiff decided to accept an interview with KTTV. Two days later, on Christmas Eve, the Departmental Review Board ordered Plaintiff transferred to Mule Creek.

The Director of State Corrections, and the two corrections officers who participated in the December 24, 1993 decision, Steven Cambra ("Cambra") and Julio Valadez ("Valadez") submit by affidavit that they were not aware of Plaintiff's impending interview when they recommended transfer. But, the history of retaliation against Plaintiff and the irregular transfer procedures employed in this case fail to support the corrections officials' conclusory statements.[15]

---

14. Plaintiff asserts an Eighth Amendment claim based on prison officials' deliberate indifference to his medical need for a single cell. The Court does not reach Plaintiff's Eighth Amendment claim at this stage of the proceedings because Plaintiff's retaliation claim alone warrants issuance of a Preliminary Injunction.

15. Plaintiff has presented evidence that corrections officials at Donovan knew of Plaintiff's interview before it occurred. Plaintiff has also identified a December 22, 1993, telephone call between a Donovan prison official and a top Gomez assistant in Sacramento on the subject of Plaintiff's interview. *See* note 7, *supra.*

### b. *Irregular Procedures.*

Under standard Departmental Review Board procedure, a staff member prepares materials regarding a particular inmate, schedules a Departmental Review Board meeting, and then presents a transfer recommendation at that meeting. Valadez Depo. at 42. Meetings are generally held monthly, and 10 to 15 cases are considered at each meeting. *Id.* at 53–54. These procedures were not followed in this case. The hurried Christmas Eve meeting covered Plaintiff's case only, and involved no staff preparation or recommendation. *Id.* at 63–64.

Plaintiff's transfer is particularly suspect in light of Defendants' attempt to obscure the origin of the transfer order. Defendants initially represented that the decision to transfer Plaintiff to Mule Creek arose at a standard Departmental Review Board meeting on December 24, 1993, and that the decision was made after a review of the Donovan warden's December 1 recommendation that Plaintiff be transferred back to Tehachapi. It was later revealed that there was no meeting on December 24, just a telephone call from Steven Cambra [16] to Julio Valadez, and the decision to transfer Plaintiff was not based on the December 1 recommendation, but on a direct order from the Director.[17] Valadez Depo. at 61–62; Cambra Depo. at 11. It also came out that Ed Myers, one of the alleged participants in the December 24 "meeting," had no memory of the meeting or of signing the declaration submitted to this Court.[18] Myers Depo. at 17.

Cambra claims he does not recall when Gomez instructed him to move Plaintiff further north, and Gomez only states it was sometime in December. Cambra Depo. at 12; Gomez Decl. According to Cambra, it is unusual for Gomez to take an interest in a particular inmate. No defendant explains the individual attention to Plaintiff's case, and the circumvention of normal Departmental Review Board procedures.[19] For example, Defendants do not explain why they never consulted Plaintiff in light of their stated intent to do him a favor.

### c. *Treatment at Mule Creek.*

Plaintiff was summarily placed in a double cell despite his assertion that his medical condition required that he be housed in a single cell. Plaintiff was then given a work assignment that conflicted with all visitation hours, notwithstanding Defendants' professed desire to locate Plaintiff closer to his family.[20]

### d. *History of Retaliation.*

On two prior occasions, courts have found actual or probable retaliation against Plaintiff by state corrections officials.[21] On numerous

---

**16.** Cambra is the corrections official who ordered Plaintiff transferred from San Quentin to Folsom in 1989, prompting this Court to issue a preliminary injunction.

**17.** Cambra, who initially testified that there was a formal meeting, later admitted that it could have been a telephone call. Cambra Depo. at 40. Valadez confirmed that the December 24 "meeting" was simply a phone call. Valadez Depo. at 58. Both Cambra and Valadez now concede that the December 1 recommendation did not provide the basis for the December 24 transfer order. See Cambra Depo. at 16–17.

**18.** Moreover, neither Cambra nor Valadez can explain how the record of the December 24 "meeting" came into existence. Cambra Depo. at 22–23; Valadez Depo. at 65. And, although Cambra says his information regarding Plaintiff came from Valadez, Valadez in turn claims that he had never discussed Plaintiff's case until Cambra called him. Cambra Depo. at 21; Valadez Depo. at 64.

**19.** On June 7, 1994, the Court did receive by mail a supplemental declaration on behalf of Defendant Gomez. In that declaration, the Director states that "several months ago, in 1993," he was contacted by unidentified lobbyists for unidentified state legislators. Apparently the lobbyists claimed that they had been contacted by unidentified "emissaries" of Pratt who had requested that Pratt be moved to Northern California to be closer to his family. Director Gomez claims that his interest in Plaintiff's case derived from these contacts.

Even so, if the transfer was motivated by a desire to accommodate Pratt there's no showing that Pratt ever requested a transfer to Mule Creek or was even asked about it.

**20.** Plaintiff was given an alternate work assignment only after he complained to this Court.

**21.** *See* note 5, supra.

other occasions, Plaintiff has claimed retaliation.[22]

The timing of Plaintiff's transfer, the irregular procedures employed, the treatment of Plaintiff at Mule Creek, and the history of retaliation against Plaintiff, all point to a retaliatory motive in moving plaintiff to Mule Creek and placing him in a double cell. Defendants do not set forth any neutral institutional objectives to justify their actions.[23] Rather, they claim they acted out of goodwill towards Plaintiff. Under the circumstances of this case, and for the reasons set forth above, it is doubtful, indeed, that Defendants were acting out of goodwill towards Plaintiff.

Plaintiff has demonstrated probable success on his retaliation claim.

## C. Balance of Hardships

The Court must weigh possible aggravation of Plaintiff's medical condition[24] and chilling of Plaintiff's first amendment rights[25] against the state's interest in managing its own prisons.

The state's interest in managing its own prisons is substantial, and federal courts should not lightly interfere. But here, Plaintiff has demonstrated probable retaliation against exercise of his first amendment rights, and the possibility of irreparable injury to his medical condition if a preliminary injunction does not issue.

All of the foregoing constitutes this Court's findings of fact and conclusions of law.

Accordingly,

1. Defendants are enjoined, during the pendency of this action, from housing Plaintiff other than in a single cell in a Level III prison.

2. In the event of a bona fide emergency, such as a fire or earthquake, this Order does not preclude temporarily relocating Plaintiff, provided that as soon as feasible Plaintiff is restored to a single cell in a Level III prison as required by this Order, and provided, further, that the Court and opposing counsel are fully and promptly informed of all relevant details justifying the temporary relocation.

3. This Preliminary Injunction is binding on the Director of the California Department of Corrections, his officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with him who receive actual notice of the order by personal service or otherwise.

4. No person who has notice of this Preliminary Injunction shall fail to comply with the letter and spirit hereof nor shall any person subvert the letter or spirit hereof by any sham, indirection, or other artifice.

5. The Court retains jurisdiction to modify this Preliminary Injunction at any time and from time to time on its own motion or upon the motion of any party in the interest of effectuating its intendments or in the interest of furthering the ends of justice under all applicable law.

6. The above Preliminary Injunction is effective upon Plaintiff's giving and filing a security in cash or corporate surety in the sum of $500.

---

22. *See, e.g.,* note 4 supra.

23. Defendants claim that Plaintiff was forced to occupy a double cell at Mule Creek because no single cells were available due to overcrowding. However, Defendants have not explained why, after nearly twenty-three years of single cell status, Plaintiff would be transferred to an institution where he would be forced to occupy a double cell.

24. *See* supra, page 568, for a discussion of Plaintiff's medical condition.

25. Plaintiff's exercise of his first amendment rights is critical to his longstanding effort to prove his innocence.