**Elmer PRATT, Plaintiff–Appellee,**

v.

**James K. ROWLAND; James Gomez, Director; Daniel Vasquez; Robert Borg, et al., Defendants–Appellants.**

No. 94–16370.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 10, 1995.

Decided Sept. 18, 1995.

Peter J. Siggins and Susan Duncan Lee, Deputy Attorneys General, San Francisco, CA, for defendants-appellants.

Valerie C. West, Oakland, CA, for plaintiff-appellee.

Before: HALL, WIGGINS, and LEAVY, Circuit Judges.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge:

Various officials of the California Department of Corrections ("DOC") appeal the district court's grant of a preliminary injunction against them. The district court found that Pratt, a state prisoner, had demonstrated a likelihood of success on his claim that prison officials had transferred him from one facility to another and had placed him in a double cell in retaliation for Pratt's exercise of protected First Amendment rights. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1). Because we find that the district court's decision was based upon clearly erroneous findings of fact, we reverse.

## BACKGROUND

Elmer "Geronimo" Pratt is serving a life sentence in California state prisons following his 1972 conviction for first degree murder. Pratt, who was a leader of the Southern California Black Panther Party, has maintained since his arrest that he was framed by the Federal Bureau of Investigation ("FBI") and is innocent of the crime of which he was convicted. He and his supporters have conducted a long and, at times, highly visible publicity campaign in an effort to secure a new trial and his eventual release from custody.

In addition, Pratt has had some success over the years in various lawsuits he has

brought against DOC officials. In 1981, Pratt obtained a jury verdict that he had been unlawfully held in solitary confinement for several years, for retaliatory reasons. In 1989, upon being transferred from San Quentin to Folsom prison, Pratt filed the original complaint in the present case,[1] alleging that the transfer was done in retaliation for his testimony in federal court about alleged FBI corruption; he obtained a preliminary injunction ordering his return to San Quentin.

Pratt was later moved to Tehachapi prison, a maximum security facility in Southern California. In August 1991, he amended his complaint and moved for another preliminary injunction, asking that the district court order his release from administrative confinement into the general population at Tehachapi. While the district court denied this request, it nonetheless expressed concerns that prison officials had been harassing Pratt due to his notoriety and active pursuit of litigation. The court therefore enjoined the defendants from harassing or retaliating against Pratt for his exercise of media, legal, or political activities.

The injunction at issue in the present appeal relates to events which took place in late 1993 and early 1994. In August 1993, Pratt was transferred from Tehachapi to the R.J. Donovan Correctional Facility ("Donovan"), near San Diego, for a ninety-day psychiatric diagnostic program. On December 1, 1993, at the conclusion of the program, Donovan's warden recommended that Pratt be returned to Tehachapi.

Such a move would likely have been appropriate. According to California's system for classifying prisoners, Pratt apparently should be housed in a Level IV, or maximum security, facility, such as Tehachapi.[2] Instead, Pratt was sent in January 1994 to Mule Creek Prison, a Level III, or medium security, facility near Sonoma in Northern California.

The parties disagree as to the reasons for this transfer and this disagreement is at the heart of the present appeal. Briefly, the defendants claim that Pratt was transferred to Mule Creek in order to accommodate the wishes of Pratt and his supporters. They note that they had received numerous requests to house Pratt in a facility near the San Francisco Bay Area, where his wife and children reside. In particular, the defendants point to a 1991 letter from then-California Assembly Speaker Willie Brown, asking that Pratt be considered for placement in Northern California, and to alleged telephone calls in December 1993 to the Director of DOC, defendant James Gomez, from staff members for two other, unnamed legislators, making similar requests.

Pratt, on the other hand, argues that his transfer and subsequent double-celling were done in retaliation for his exercise of First Amendment rights. He contends that he was transferred to Mule Creek in response to his decision to grant an interview to the Los Angeles Fox television network affiliate, in which he repeated his longstanding claims that he is innocent and was framed by the FBI. He notes that DOC did not follow standard procedures in deciding to transfer him to Mule Creek; the alleged irregularities include an unusual telephone call from Director Gomez to the Regional Administrator, defendant Steven Cambra, asking that he "consider Pratt for placement further North." While the exact timing of the telephone call is hotly disputed, it is undisputed that the call was followed shortly by a telephonic review board meeting convened on Christmas eve for the sole purpose of discussing Pratt's case.

With a few exceptions, Pratt has been housed exclusively in single cells during his twenty-three years in prison. Upon his arrival at Mule Creek, however, Pratt was

---

1. We note that this case has been pending before the district court, with an oft-amended and expanding complaint, for almost six years. During that time, there have been several skirmishes between the parties on motions for preliminary relief, but little apparent progress toward resolution of the merits of the case.

2. Among Pratt's allegations in the present case is a claim that he has been improperly assigned a Level IV classification due to the presence of erroneous information in his prison file. Because there has been no progress toward resolution of that claim, however, we assume for present purposes that Pratt is properly classified as a Level IV prisoner.

placed in a two-person cell. He claims that double-celling causes him serious health problems. Specifically, he claims to suffer from post-traumatic stress disorder ("PTSD") brought on by his two tours of duty in Vietnam, which makes it extremely difficult for him to sleep in the presence of other people. He also has serious bowel problems, apparently related to injuries he sustained in Vietnam and allegedly exacerbated by the stress of sharing a cell with another person. The defendants dispute much of Pratt's medical evidence.

The defendants argue that Pratt was placed in a double cell at Mule Creek because the facility is operating at well over 200% of capacity. Pratt nevertheless contends that his being double-celled after more than twenty years of almost continuous single-celling is suspicious because it followed so closely on the heels of his media activity. He further notes that while the defendants' avowed purpose for transferring him to Mule Creek was to facilitate visits by his family, Pratt was initially given job assignments which conflicted with visiting hours and precluded his seeing any visitors at all. This schedule conflict was resolved when Pratt brought it to the district court's attention.

We note that Pratt does not in this appeal seriously contest his continued detention at Mule Creek. He does not, for example, request that he be returned to Donovan or Tehachapi. His main complaint relates to the double-celling issue.

On February 24, 1994, the district court granted a temporary restraining order, requiring Pratt to be moved to a single cell, in a medium security prison such as Mule Creek. After briefing, some discovery, and a hearing, the district court held that Pratt had demonstrated a likelihood of success on the merits of his retaliation claim and granted a preliminary injunction. *Pratt v. Rowland,* 856 F.Supp. 565 (N.D.Cal.1994). The state defendants appeal.[3]

## STANDARD OF REVIEW

■ A preliminary injunction is appropriate if the moving party demonstrates either (1) a probability of success on the merits and a possibility of irreparable injury, or (2) serious questions going to the merits and the balance of hardships tipping sharply in his favor. *Chalk v. United States Dist. Ct.,* 840 F.2d 701, 704 (9th Cir.1988). These are not discrete tests, but are instead "outer reaches 'of a single continuum.' " *Id.* (citations omitted).

■ "The grant or denial of a motion for a preliminary injunction lies within the discretion of the district court, and its order will be reversed only if the court relied on an erroneous legal premise or otherwise abused its discretion." *Id.* An "abuse of discretion" occurs if the district court misapprehends the applicable legal issues or rests its conclusions on clearly erroneous findings of fact. *Id.*

## DISCUSSION

Pratt raised two distinct legal theories in the district court. First, he alleged that his transfer to Mule Creek and subsequent double-celling were done in retaliation for the interview he gave to Fox television in December 1993. Under this theory, Pratt argues, the retaliatory actions are illegal regardless of whether he has an independent right to be held at any particular prison or in any given type of cell. Pratt's second claim was that when the defendants placed him in a double cell, allegedly leading to exacerbation of his PTSD and bowel conditions, they exhibited deliberate indifference to his serious medical needs, in violation of the Eighth Amendment. The district court granted the preliminary injunction on the basis of the retaliation claim only, finding it unnecessary to reach the Eighth Amendment questions at this stage of the proceedings. *Pratt,* 856 F.Supp. at 569 n. 14. Similarly,

---

**3.** Of the people involved in the events related to the preliminary injunction at issue in this appeal, only Director Gomez was a defendant prior to Pratt's February 1994 application for a temporary restraining order and subsequent request for preliminary relief. After briefing was almost completed in this court, the district court allowed Pratt to file a Third Amended Complaint, adding the Warden and a Deputy Warden at Mule Creek as defendants, and including allegations and a prayer for relief relating to the Mule Creek transfer and double-celling.

we express no opinion on the Eighth Amendment issues potentially involved in this case.

## I

### (a) *Ninth Circuit retaliation law*

The district court correctly found that Ninth Circuit case law has recognized that retaliation claims like Pratt's state a valid cause of action under § 1983. In *Rizzo v. Dawson*, 778 F.2d 527 (9th Cir.1985), for example, we held that prison officials could not transfer an inmate to another prison in retaliation for the inmate's exercise of his First Amendment right to pursue federal civil rights litigation. *Id.* at 531. In fact, we recently recognized that the prohibition against retaliatory punishment is "clearly established law" in the Ninth Circuit, for qualified immunity purposes. *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir.1995). *See also Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir.1994).[4]

■ This is so despite the fact that prisoners generally have no constitutionally-protected liberty interest in being held at, or remaining at, a given facility. *See, e.g., Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). To succeed on his retaliation claim, Pratt need not establish an independent constitutional interest in either assignment to a given prison or placement in a single cell, because the crux of his claim is that state officials violated his *First Amendment* rights by retaliating against him for his protected speech activities.

■ Because a prisoner's First Amendment rights are necessarily curtailed, however, a successful retaliation claim requires a finding that "the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals." *Rizzo*, 778 F.2d at 532 (citing *Franklin v. Murphy*, 745 F.2d 1221, 1230 (9th Cir.1984)). The plaintiff bears the burden of pleading and proving the absence of legiti-

mate correctional goals for the conduct of which he complains. *See id.*

### (b) *Effect of Sandin v. Conner*, 115 S.Ct. 2293 (1995)

While this appeal was pending, the Supreme Court decided *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), which arguably called into question the continuing validity of our retaliation cases. We asked the parties to submit supplemental briefs on the question, and now conclude that the retaliation cases remain good law. *Sandin* does, however, contain language which we interpret as a reminder from the Court that federal courts should be circumspect when asked to intervene in the operation of state prisons. While *Rizzo* and its progeny survive *Sandin*, we conclude that they should be applied in light of this more deferential attitude.

*Sandin* involved a Hawaii state prisoner who claimed that his procedural due process rights had been violated by the state's refusal to allow him to call certain witnesses at a disciplinary hearing. Following a well-established line of cases, the Ninth Circuit held that Hawaii prison regulations created a protected liberty interest in remaining free of disciplinary segregation and that there was a disputed issue of fact as to whether the procedural safeguards afforded Conner had been sufficient. *Conner v. Sakai*, 15 F.3d 1463, 1466–68 (9th Cir.1993) (citing, *inter alia, Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)), *rev'd*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Supreme Court reversed, holding that neither the prison regulations in question nor the Due Process Clause itself created a liberty interest entitling Conner to heightened procedural protections. —— U.S. at ——, 115 S.Ct. at 2302.

*Sandin* did not involve the same type of claim as that raised in the present appeal.

---

4. That retaliatory actions by prison officials are cognizable under § 1983 has also been widely accepted in other circuits. *See, e.g., Frazier v. Dubois*, 922 F.2d 560, 561–62 (10th Cir.1990); *Madewell v. Roberts*, 909 F.2d 1203 (8th Cir.

1990); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir.1987); *Bridges v. Russell*, 757 F.2d 1155 (11th Cir.1985); *Buise v. Hudkins*, 584 F.2d 223 (7th Cir.1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).

Instead, Conner relied on a line of cases based upon *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), in which courts examined prison regulations to decide whether the regulations created protected liberty interests. Those regulations which used "language of an unmistakably mandatory character," *id.* at 471–72, 103 S.Ct. at 871–72, created liberty interests subject to the protections of the Due Process Clause, whereas those phrased in less "mandatory" terms did not. The Supreme Court in *Sandin* abandoned this methodology, finding it unwieldy and inappropriate. *Sandin,* —— U.S. at —— & n. 5, 115 S.Ct. at 2300 & n. 5.

The Supreme Court's opinion in *Sandin* contains strong language suggesting the Court's desire to avoid excessive federal judicial involvement in prison administration. The Court noted in particular "the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment," especially with regard to "the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims" under § 1983. *Id.* at ——, 115 S.Ct. at 2299.

While *Sandin* represents a significant departure from the Court's § 1983 prisoner Due Process methodology, the majority makes clear in a concluding footnote that the decision does not close other avenues by which prisoners can challenge official actions. In particular:

> Prisoners such as Conner, of course, retain other protection from arbitrary state action.... They may invoke the First and Eighth Amendments and the Equal Protection Clause of the Fourteenth Amendment where appropriate ...

*Id.* at —— n. 11, 115 S.Ct. at 2302 n. 11. The Ninth Circuit's retaliation cases, such as *Rizzo, Schroeder,* and *Barnett,* fall within the "other protection[s] from arbitrary state action" which the Court appears to envision, because they are based upon protection of the prisoners' First Amendment rights, and not their Due Process rights. We therefore hold that the retaliation cause of action, as developed in such cases as *Rizzo, Schroeder,* and *Barnett,* survives *Sandin.*

We think it appropriate, however, to take account of the general tenor of the Court's discussion in *Sandin* of prisoner claims. As mentioned above, the Court specifically expressed its disapproval of excessive judicial involvement in day-to-day prison management, which "often squander[s] judicial resources with little offsetting benefit to anyone." *Id.* at ——, 115 S.Ct. at 2299. While we reaffirm the *Rizzo* line of cases, therefore, we also conclude at the same time that we should evaluate retaliation claims in light of these general concerns expressed in *Sandin.* In particular, we should "afford appropriate deference and flexibility" to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. *Id.*

## II

In view of the law of this circuit, as discussed above, we agree in principle with the argument advanced by Pratt and accepted by the district court: it would be illegal for DOC officials to transfer and double-cell Pratt solely in retaliation for his exercise of protected First Amendment rights. Where we part company with Pratt and the district court, however, is in the existence in the current record of facts to support this scenario. Our review of the record leads us to conclude that there is no probative evidence to establish a crucial link in the logical chain required to support the district court's finding of retaliation. Additionally, we disagree with the district court's conclusion that the defendants had proffered no legitimate correctional goals to justify their actions. We therefore hold that the district court's factual findings were clearly erroneous and that the grant of a preliminary injunction must be reversed.

Pratt contends that his transfer to and double-celling at Mule Creek were done in retaliation for his December 1993 decision to grant an interview to the Los Angeles Fox television affiliate. The interview aired on three consecutive days in early January 1994. In the interview, Pratt repeated his well-known claims of innocence and official wrongdoing.

■ In finding that the defendants acted with a retaliatory motive, the district court relied in large part on the timing of Pratt's interview request and the subsequent transfer. True, timing can properly be considered as circumstantial evidence of retaliatory intent. *See, e.g., Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1316 (9th Cir.1989). In this particular case, however, there is little else to support the inference.

■ Most importantly, there is insufficient evidence to support the district court's finding that Gomez and other DOC officials who were involved in the transfer decision were actually aware of the Fox interview. The only evidence purportedly establishing that any relevant defendants had knowledge of the interview consists of a telephone call from a Lieutenant Daniels at Donovan to Tip Kindel in the Sacramento communications office of the DOC. In this call, Daniels told Kindel that Pratt wished to give a television interview and asked for a clarification of the rules regarding prisoners' media contacts. From this single conversation with a DOC employee in Sacramento—there is no evidence that Daniels and Kindel spoke again, or that anyone else in Sacramento was in any way involved with the interview request—the district court concluded that Gomez and the others who participated in the review board which approved Pratt's transfer must have been aware of the interview.

With all due respect, we cannot agree. It is sheer speculation to assume that Kindel discussed this one specific telephone call with his superiors. Pratt does not, for example, suggest that DOC employees have a policy of alerting Gomez or other top officials whenever any high profile prisoner has media contacts, and there is no suggestion that the day-to-day activities of Pratt himself were monitored that closely in Sacramento. There is similarly no indication that Gomez or the other defendants were made aware of the Fox series by other means, such as requests for comments by the reporter. To the contrary, the record contains sworn assertions by all relevant participants in the transfer decision, including Director Gomez, that they were unaware of the Fox interview.

The review board convened to transfer Pratt from Donovan to Mule Creek on December 24, 1993. The television interview did not take place until December 27, and the series aired in early January 1994. We find that the timing of these events, far from establishing that Pratt was transferred in retaliation for the Fox interview, leads us to the opposite conclusion. The district court therefore erred in finding that Pratt's transfer was effected for retaliatory reasons.

With regard to the decision to place Pratt in a double cell at Mule Creek, we find a similar lack of evidence to establish that the Mule Creek officials were aware of the Fox interview. Pratt appears to assume that DOC officials in Sacramento communicated to unspecified Mule Creek personnel that Pratt should suffer retaliation. There is nothing in the record, however, to support this assumption.

The district court erred in another respect. As discussed above, Pratt must show that there were no legitimate correctional purposes motivating the actions he complains of. In a discussion consisting of only three sentences, the district court wrote:

> Defendants do not set forth any neutral institutional objectives to justify their actions. Rather, they claim they acted out of goodwill towards Plaintiff. Under the circumstances of this case ... it is doubtful, indeed, that Defendants were acting out of goodwill towards Plaintiff.

*Pratt,* 856 F.Supp. at 571.

Contrary to the district court's observation, however, the defendants do, in fact, argue that Pratt's transfer and cell placement were justified by "neutral institutional objectives." They insist that Pratt's transfer to a prison in Northern California was intended to allow Pratt to be closer to his wife and children, who reside in the Bay Area and had difficulty visiting him in Southern California.

The defendants contend, and we see no reason not to believe, that proper penological practice is to encourage prisoners to maintain contacts with their family members. Pratt, in fact, married his wife and had two children while incarcerated at San Quentin. Keeping families intact is a "legitimate cor-

rectional goal" sufficient to justify Pratt's transfer to Mule Creek, in Sonoma County.[5]

In this regard, we cannot be blind to the fact that Pratt and his supporters have apparently been lobbying DOC for some time to transfer him to a Northern California prison. The defendants put into evidence a letter from State Assembly Speaker Willie Brown, personally asking that Pratt be considered for a transfer north, and Director Gomez stated in an affidavit that staff members for two other legislators had made similar requests.

The district court stated in a footnote that "[a]ccording to Plaintiff, his greatest public support for his claims of innocence is in Southern California." 856 F.Supp. at 568 n. 9. We do not find such a statement by Pratt in the record. In any event, it is completely at odds with the uncontroverted evidence that Pratt has been lobbying for a transfer north for some time. In fact, it is at odds with Pratt's own complaint in this case, which repeats his longstanding request to be transferred north. *See, e.g.,* Third Amended and Supplemental Complaint for Damages and Injunctive Relief, Clerk's Record ("CR") 204, at 27 (alleging that Pratt's transfer to Tehachapi was wrongful in part because the "facility is ... located hundreds of miles from Pratt's wife and two children," making it difficult for them to visit, "thus increasing Pratt's already heightened stress anxiety from PTSD"); *id.* at 30 (alleging need to be transferred to a prison "which is a reasonable distance from Pratt's wife and two children").

Especially in view of the fact that he has at no time during these proceedings asked to be returned to Donovan or Tehachapi, we assume that Pratt's complaint is not really that he was transferred to northern California. Instead, Pratt appears to want a transfer to a "better" northern California prison, even closer to the Bay Area. Such a decision, however, is for the DOC—not Pratt, and not a federal court—to make.

Contrary to the district court's observation, the defendants do advance a legitimate reason for Pratt's initial placement in a double cell. The evidence establishes that at the time of his transfer to Mule Creek, that facility was operating at well over 200% of capacity and Pratt was double-celled due to the lack of available cell space. *See, e.g.,* Declaration of Steve Cambra, CR 161, at 3 (ER 45) (in February 1994, Mule Creek was operating at 221.8% of designed capacity, "practically all prisoners are housed two to a cell, and there have also been additional dormitory housing units fashioned from parts of the prison originally designed for a purpose other than housing"); DOC Classification Form, Jan. 13, 1994, Exhibit A to CR 164 (ER 67) ("Committee informed [Pratt] that, due to extensive overcrowding at [Mule Creek State Prison], single-cell status would not be available. Committee assured [Pratt] that staff would work with him in securing a cell partner that he would be compatible with.... [Pratt] is fully cognizant of the decision rendered this date and expressed agreement."); Deposition of Glenn Mueller, Chief Deputy Warden of Mule Creek State Prison, at 25–26 (ER 602–03) (decision to place Pratt in a double cell "was based on the fact that we were at 200–plus percent of designed capacity, that [a] single cell is not available in this institution"); Deposition of Robert Lee Worthy, at 25 (ER 612) (Pratt was told on arrival at Mule Creek "that he would be double-celled here, we couldn't afford the luxury of single-celling based on population pressures").

Apparently questioning why Pratt was transferred to Mule Creek in particular, when it was operating so far over capacity, the district court wondered "why, after nearly twenty-three years of single cell status, Plaintiff would be transferred to an institution where he would be forced to occupy a double cell." *Pratt,* 856 F.Supp. at 571 n. 23. The record supports one legitimate reason: *all* of California's medium security prisons were in 1994—and presumably continue today to be—equally crowded. *See, e.g.,* Cambra Declaration at 3–4 (ER 45–46); Exhibit C to Cambra Declaration (ER 54–55) (Week-

---

5. The district court placed considerable weight on the fact that, upon his arrival at Mule Creek, Pratt was initially given a job assignment which conflicted with all visiting hours. This situation was eventually rectified. We do not agree that this fact, alone or in combination with other circumstances, supports a finding of retaliation.

ly Report of Population of California prisons, as of February 6, 1994, showing all medium security facilities near or above 200% capacity). Pratt's contention that his double-celling at Mule Creek must have been retaliatory because he occupied a single cell during most of the preceding twenty-three years in prison overlooks a similar point: one of the reasons Pratt was single-celled for so long was that *all* prisoners in California were single-celled until the recent explosion in the prison population. Pratt's placement in a double cell may be nothing more than an indication of the changing times in California prisons. On the record at this point in the proceedings, we cannot agree that it proves retaliatory intent, especially retaliation linked to the Fox television interview.

In sum, we hold that the district court erred both in finding that Pratt had shown a likelihood of success in proving retaliation and in concluding that the defendants proffered no legitimate correctional reasons for the transfer and double-celling.[6] Accordingly, it was error to grant preliminary relief.

The district court's order is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

---

6. For the same reasons, we also conclude that Pratt has not raised "serious questions" going to the merits. *Chalk*, 840 F.2d at 704. In any event, we would not find that the balance of hardships tips "sharply" in Pratt's favor. *Id.*