107 F.3d 877
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Michael D. JACOBS, Plaintiff-Appellant,
v.
Ron ANGELONE; Robin Bates; George Deeds, Warden; Sherman
Hatcher, Warden; Gary True, Associate Warden Operations;
Leon Smith, Associate Warden Programs; Connie Moore; Tom
Smith; Nathan D. O'Neal; Tom Gegan, (Correctional
Counselors), Defendants-Appellees.
 No. 95-16593.
 United States Court of Appeals, Ninth Circuit.
 Submitted Nov. 8, 1996.*
Decided March 03, 1997.
 
 Before: FLETCHER, FARRIS, and TASHIMA, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Michael D. Jacobs, a prisoner proceeding pro se, appeals from the district court's entry of judgment as a matter of law (JMOL) against him on his 42 U.S.C. § 1983 claims. Jacobs alleged that defendants, officials of the Nevada prison system: (1) violated the Eighth Amendment by transferring him into dangerous situations; (2) denied him due process and subjected him to double jeopardy by trying him twice for the same disciplinary infraction; (3) violated the First Amendment by retaliating against him after he filed a civil rights suit; and (4) conspired to accomplish these violations. We affirm the grant of JMOL on Jacobs' due process and double jeopardy claims, but reverse and remand on his remaining claims.
 
 I. Facts
 
 3
 Shortly after he entered the Nevada prison system in 1988, Jacobs filed a civil rights suit against prison officials, in which he eventually prevailed. The present suit alleges new violations since he filed his first suit.
 
 
 4
 According to Jacobs' uncontradicted trial evidence, prison officials have repeatedly transferred him into potentially dangerous situations. This first happened after a disciplinary hearing in December 1988, when he was transferred to Nevada State Prison (NSP) and housed in the same population as Eugene Davis, an "Aryan Warrior" who had killed Jacobs' brother in prison less than a year earlier. Prison officials moved Jacobs two weeks later, but then transferred him back to a prison where Davis was incarcerated (Ely State Prison, or "ESP") for the second time in October 1989. There, he was placed in a cell located directly below Davis' cell: both cells accessed the same recreation areas. After a few days, Jacobs was moved away from Davis and then out of ESP entirely. Four months later he was transferred back to ESP, and thus into the same population as Davis, for the third time. This placement lasted only a week, but he was transferred to ESP for a fourth time in January 1991, where he remained for several weeks until he was moved again. Finally, in April 1992, he was transferred to NSP again. Although Davis was not incarcerated at NSP at that time, the Aryan Warriors were a strong, violent presence at NSP. Soon after that transfer, Jacobs was attacked and stabbed by two white inmates who asked him whether he was investigating his brother's murder. According to Jacobs' evidence, the attackers were Aryan Warriors and associates of Davis.
 
 
 5
 Throughout this sequence of transfers, Jacobs repeatedly told prison officials that it would be dangerous to house him with Davis, and prison officials repeatedly noted that there was an "enemy situation" and even that there was a "Special Important enemy situation." They also concluded, at some point, that Davis had not acted alone when he killed Jacobs' brother.
 
 
 6
 Jacobs also introduced evidence to show that he was tried twice for a single alleged disciplinary infraction after a prison riot. The committee found Jacobs not guilty at the first hearing. A prison official then declared the committee's decision void, convened a new committee, tried Jacobs again, found him guilty, and sentenced him to disciplinary segregation with loss of statutory good-behavior time.[1]
 
 
 7
 Jacobs also offered or tried to offer evidence of a variety of other incidents to prove his retaliation claim.[2]
 
 
 8
 At the close of Jacobs' case, defendants made a Rule 50 JMOL motion. Without addressing Jacobs' First Amendment or conspiracy claims, the district court granted JMOL.
 
 II. Standard of Review
 
 9
 We review a JMOL de novo. Pierce v. Multnomah County, 76 F.3d 1032, 1037 (9th Cir.), cert. denied, 117 S.Ct. 506 (1996). JMOL is proper when, viewing the evidence in the light most favorable to the non-moving party, and drawing all reasonable inferences in favor of that party, the evidence permits only one reasonable conclusion. Id. If conflicting inferences may be drawn, JMOL is improper. Id.
 
 III. Eighth Amendment Claim
 
 10
 We agree with Jacobs that he introduced sufficient evidence on his Eighth Amendment deliberate-indifference-to-safety claim, to ward off JMOL.
 
 
 11
 The Eighth Amendment establishes that prison officials cannot be "deliberately indifferent" to "inmate health or safety." Farmer v. Brennan, 114 S.Ct. 1970, 1977 (1994) (citation omitted). Thus, transfers made with deliberate indifference to an inmate's safety violate the Eighth Amendment. Fitzharris v. Wolff, 702 F.2d 836, 839 (9th Cir.1983). To establish such a violation, a prisoner must show that: (1) he has been transferred into "conditions posing a substantial risk of serious harm;" (2) prison officials were aware of the risk; and (3) prison officials disregarded the risk. Farmer, 114 S.Ct. at 1977, 1979.
 
 
 12
 Jacobs offered sufficient evidence to prove each of these elements. First, according to his uncontradicted testimony, he was transferred into prisons housing his enemy Davis on four separate occasions. A member of the white supremacist Aryan Warriors, Davis had killed Jacobs' brother while incarcerated in a Nevada prison, and had offered another inmate $2,500 to kill Jacobs. Nevertheless, defendants repeatedly transferred Jacobs into prisons housing Davis. Such exposure to a potentially murderous enemy can amount to a "substantial risk of serious harm." See, e.g., Noll v. Carlson, 809 F.2d 1446, 1449 n. 4 (9th Cir.1987) (placing prisoner in prison with known enemies); Berg v. Kincheloe, 794 F.2d 457, 460-61 (9th Cir.1986) (exposing prisoner to possibility of attack by other prisoners); Fitzharris, 702 F.2d at 839 (transfer to prison where likely to be attacked).
 
 
 13
 Prison officials also transferred Jacobs into a prison where Davis' Aryan Warrior associates were a particularly violent and vengeful presence. Such a failure to keep gangs and their enemies separate can create a substantial risk of serious harm. Walsh v. Mellas, 837 F.2d 789, 796 (7th Cir.1988) (prison violated Eighth Amendment by failing to screen cell mates for gang conflicts). Thus, a jury might reasonably have found that Jacobs had been put at substantial risk by some or all of these transfers.
 
 
 14
 The evidence also showed that defendants were aware of the risk. Awareness can be inferred from circumstantial evidence, as when the risk of substantial harm is so obvious that prison officials "must have known." Farmer, 114 S.Ct. at 1981. It can also be proved directly, as when a prisoner gives prison officials notice of the risk. See Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir.1995) (prisoner told officials about asbestos in work area). Here, Jacobs alerted defendants to the risk created by putting him in the same prison with Davis in December 1988 (twice), October 1989, March 1990 (twice), January 1991, and March 1992. The prison log shows that these alerts had their intended effect: officials noted that Jacobs and Davis had an "enemy situation" in January 1989, July 1989, October 1989, November 1989, March 1990 ("Special Important enemy situation"), March 1990 (again), January 1991, and April 1992 ("this is reflected throughout log"). A reasonable jury could have found that defendants were aware of the risk they created by housing Jacobs with either Davis or Davis' gang.
 
 
 15
 Finally, Jacobs offered sufficient evidence to prove that defendants disregarded the risk created by these transfers, i.e., that they failed to respond to a known risk reasonably. Farmer, 114 S.Ct. at 1982-83. Jacobs was transferred into high-risk situations not once, but five times. The cumulative effect of these transfers was to place Jacobs in danger for several weeks. A jury could have found such transfers, and leaving Jacobs in those risky situations for a cumulative total of several weeks, was unreasonable.[3]
 
 IV. Due Process and Double Jeopardy Claims
 
 16
 Jacobs argues that the district court erred when it granted JMOL on his due process-double jeopardy claims. We disagree.
 
 
 17
 Double jeopardy does not apply to prison disciplinary proceedings. It is limited to criminal prosecutions and to some non-criminal procedures where the penalties imposed serve a punitive rather than remedial function. United States v. Halper, 490 U.S. 435, 448-49 (1989). Disciplinary proceedings are not criminal prosecutions. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). Therefore, the Double Jeopardy Clause does not apply to repeated disciplinary hearings. See, e.g., Meeks v. McBride, 81 F.3d 717, 722 (7th Cir.1996); Gorman v. Moody, 710 F.Supp. 1256, 1266 (N.D.Ind.1989). Cf. United States v. Brown, 59 F.3d 102, 104-06 (9th Cir.1995) (prisoners can be tried for a single offense in both disciplinary and criminal settings without offending the Double Jeopardy Clause).
 
 
 18
 Nor did Jacobs offer sufficient evidence to show a due process violation. The Supreme Court has recently narrowed the scope of due process protection for prisoners. Sandin v. Conner, 115 S.Ct. 2293, 2300 (1995). Under Sandin, even violation of mandatory state regulations does not support a due process claim, unless prison officials seek to "impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id.; see also Keenan v. Hall, 83 F.3d 1083, 1088 (9th Cir.1996) (must show "major difference between the conditions for the general prison population and the segregated population" to trigger due process rights). Jacobs' evidence did not meet these requirements. He did not point to any mandatory language in the Nev.Pen.Code.[4] Nor did he introduce evidence to show that his discipline imposed "atypical" conditions. Sandin, 115 S.Ct. at 2301 (30 days disciplinary segregation not "atypical" where no evidence that different from other kinds of segregation); Mujahid v. Meyer, 59 F.3d 931, 932 (9th Cir.1995) (14 days disciplinary segregation).[5]
 
 
 19
 V. First Amendment Retaliation Claim.
 
 
 20
 Jacobs also alleged that defendants had retaliated against him for his law-related activities, thereby violating the First Amendment. Although he repeatedly asserted this claim throughout the pleadings and the trial, the district court never acknowledged it. Because the district court apparently did not recognize that Jacobs was attempting to prove a retaliation claim, it excluded probative retaliation evidence.
 
 
 21
 Because the activities associated with civil rights litigation are protected under the First Amendment, NAACP v. Button, 371 U.S. 415, 428-31 (1963), prison officials may not retaliate against prisoners for such law-related activities. See, e.g., Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir.1995) (transferring or double-celling a prisoner in retaliation for law-related activities can violate First Amendment); Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir.1994) (reclassification of prisoner because of law-related activities can violate First Amendment); Valandingham v. Bojorques, 866 F.2d 1135, 1138-39 (9th Cir.1989) (inciting violence against an inmate because of law-related activities can violate First Amendment). A prisoner who alleges retaliation must show not only that undesirable treatment followed law-related conduct, but also that such treatment did not serve a legitimate penological interest or was not narrowly tailored to do so. Pratt, 65 F.3d at 806.
 
 
 22
 There can be no question that Jacobs alleged and attempted to prove a First Amendment retaliation claim. Count I of his Amended Complaint was entitled "Violation of plaintiff's First and Fourteenth Amendment rights regarding retaliation and harassment for law related activities." In support of this count, Jacobs specifically alleged retaliatory acts following the filing of his first civil rights suit, and asserted that these retaliatory acts served no legitimate penological purpose. Jacobs reiterated this claim in his Trial Brief, and argued it in his opening statement ("I intend to show that the defendants ... retaliated against me for participating in law related activities.").
 
 
 23
 Indeed, he even offered some fragmented evidence in support of this claim, testifying to numerous instances of undesirable treatment that followed the filing of his civil rights suit. For example, he testified that prison officials would not let him attend his father's funeral, even though they had allowed other inmates to attend funerals and even though he had found two prison guards who would escort him. Similarly, he offered evidence to support his allegations that defendants persistently transferred him into dangerous circumstances as retaliation, and that they even transferred him into non-dangerous situations to retaliate (frequent transfers prevented him from finishing self-improvement projects like computer literacy courses and law clerk training). This evidence supported Jacobs' retaliation claim. Id. at 806-07.
 
 
 24
 Jacobs' case would have been considerably stronger, however, if the court had not excluded his other evidence of retaliation. In fact, every time defendants objected to Jacobs' retaliation evidence, the court sustained the objection, apparently unaware that Jacobs was attempting to prove a retaliation claim. For example, when Jacobs attempted to introduce evidence that defendants had twice removed him from his cell on elaborate pretexts and then damaged or destroyed some of his legal papers--conduct that was both penologically unjustifiable and tellingly illustrative of the defendants' animus towards Jacobs' law-related activities--the district court sustained an objection.
 
 
 25
 When Jacobs explained that he was trying to show retaliation for law-related activities, defendants replied "that's really not a cause of action within this lawsuit," and the district court excluded the evidence saying "I agree." Similarly, when Jacobs attempted to show that prison authorities had engaged in a general pattern of harassment against inmates who filed civil rights suits--evidence which would have made an inference of retaliatory intent more plausible, see, e.g., Heyne v. Caruso, 69 F.3d 1475, 1479 (9th Cir.1995) (evidence of hostility towards general group supports inference that hostility is real motive for harmful conduct towards specific member)--the court sustained an objection, explaining "this is not relevant to your case." In so doing, it ignored Jacobs' assertion of a retaliation claim, and excluded probative evidence that would have bolstered that claim.
 
 
 26
 Exclusion of evidence is reviewed for abuse of discretion. Lewis v. Telephone Employees Credit Union, 87 F.3d 1537, 1557 (9th Cir.1996); see also United States v. Rubio-Topete, 999 F.2d 1334, 1338 (9th Cir.1993) (decision to exclude evidence as irrelevant reviewed for abuse of discretion). The district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous view of the facts. Lewis, 87 F.3d at 1557. An erroneous exclusion is reversible when it results in prejudice. Heyne, 69 F.3d at 1478. Here, the district court's ruling that Jacobs' proffered evidence was "irrelevant" was based on a clearly erroneous view of the facts (i.e., that Jacobs had not stated a retaliation claim) and was therefore an abuse of discretion. It also resulted in prejudice, gutting what may have been an otherwise viable retaliation claim by frustrating Jacobs' efforts to show defendants' penologically unjustified acts and their animus towards his law-related activity.[6] We must therefore reverse the district court's grant of JMOL on this claim.
 
 
 27
 We must also reverse for another reason. The court did not address Jacobs' retaliation claim in its Rule 50 analysis, and did not fulfill its obligation to notify Jacobs of the deficiencies in his proof and give him an opportunity to rectify them. "Federal Rule of Civil Procedure 50 requires district courts to apprise parties of the deficiencies in their proof, and to give them an opportunity to present further evidence on the dispositive facts, before granting judgment as a matter of law against them." Waters v. Young, 100 F.3d 1437, 1442 (9th Cir.1996); see also Lifshitz v. Walter Drake & Sons, Inc., 806 F.2d 1426, 1429 (9th Cir.1986) (either movant or court must identify deficiencies in nonmovant's case to satisfy Rule 50). "[T]his requirement ... is mandatory in all cases," but "it is a particularly important requirement in the case of pro se litigants." Waters, 100 F.3d at 1442. Thus, because Jacobs "did not receive the notice and opportunity to which he was entitled under Rule 50, we must reverse and remand for a new trial." Id.
 
 VI. Conspiracy
 
 28
 Finally, Jacobs alleged that defendants conspired to violate his rights. Neither defendants nor the district court acknowledged or referred to Jacobs' conspiracy claim at any point during the Rule 50 motion, depriving Jacobs of the notice and opportunity to which he was entitled. We must reverse.
 
 
 29
 AFFIRMED IN PART, REVERSED AND REMANDED IN PART. Each party shall bear his or her own costs on appeal.
 
 
 
 *
 The panel finds this case appropriate for submission without oral argument pursuant to Fed.R.App.P. 34(a) and 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3
 
 
 [1]
 Prison officials rescinded these sanctions a week later, when Jacobs prevailed on his first civil rights suit (even though these sanctions were not at issue in that first suit)
 
 
 [2]
 This evidence is summarized in Part V, below
 
 
 [3]
 As Jacobs put it in his response to the Rule 50 motion, "... they transferred me and transferred me and transferred me until this injury [the stabbing] occurred."
 
 
 [4]
 Defendants note that the Nevada Penal Code explicitly disclaims the creation of any due process rights and argue that this disclaimer is dispositive. This is clearly wrong. Such disclaimers cannot undo mandatory language in a penal code: once "the State has created a right of 'real substance' ... [it] cannot then emasculate that right merely by issuing [a] disclaimer." Gotcher v. Wood, 66 F.3d 1097, 1100 (9th Cir.1995), petition for cert. filed, 64 U.S.L.W. 3605 (U.S. Feb. 26, 1996) (No. 95-1385)
 
 
 [5]
 Moreover, it is doubtful that Jacobs suffered injury from these asserted violations. The discipline imposed at the second hearing was rescinded before any of it was put into effect
 
 
 [6]
 Defendants make no mention of this issue in their brief, but Jacobs does indeed appeal the exclusion of his retaliation evidence. Appellant's Informal Brief at 2-E to 2-F