**Mark WILSON, Plaintiff,**

v.

**CITY OF FOUNTAIN VALLEY, et al., Defendants.**

**No. SA CV 01–0147 DOC(RZ).**

United States District Court, C.D. California.

March 23, 2004.

---

Mark Wilson, Santa Ana, CA, Pro se.

John Barber, Santa Ana, CA, for City of Fountain Valley.

### ORDER:

(1) ACCEPTING THIRD REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE; and

(2) WITHDRAWING REFERENCE TO MAGISTRATE JUDGE

CARTER, District Judge.

The Court has reviewed the file in this matter, has read and reviewed the Third Report and Recommendation of United States Magistrate Judge; and has reviewed *de novo* all objections, including not only objections to the Third Report but also objections to the Second And Final Report and the First Interim Report. The Court accepts the Third Report and its findings and recommendations.

The reference to the Magistrate Judge is WITHDRAWN. The undersigned District Judge shall preside over further proceedings.

### THIRD REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

ZAREFSKY, United States Magistrate Judge.

The undersigned hereby withdraws the Second And Final Report and Recommendation filed on August 13, 2003 and, in part to respond to certain objections raised by Plaintiff, submits in its place this Third Report and Recommendation to the Honorable David O. Carter, United States District Judge. The undersigned recommends that Defendant Gillen's Motion for Summary Judgment be granted; that all remaining claims against Defendant Gillen be dismissed; that the Fountain Valley

defendants' motion to dismiss, converted by the undersigned to a motion for summary judgment and/or for judgment on the pleadings, be granted; and that all claims against the Fountain Valley defendants except claims 10 and 14 be dismissed.

## I.

### PROCEDURAL BACKGROUND PRIOR TO THE TWO CURRENT MOTIONS

In January 2001, Plaintiff Mark Wilson commenced this action under 42 U.S.C. § 1983, alleging fourteen ways in which Defendants violated his constitutional rights in 1999 and 2000. His first three claims stem from a March 1999 incident in which he alleges that Detective Mike Llorens, one of the six City of Fountain Valley police officers named in this action (collectively referred to, with the defendant City, as the "Fountain Valley defendants"), detained and questioned him without justification. His fourth, fifth and sixth claims relate to his arrest on December 1, 1999, by four of the Fountain Valley defendants (Simko, Farley, Ahlo and Long) and a state parole agent, Defendant Richard Gillen, in a manner that he contends violated his rights. In his seventh, eighth and ninth claims, Plaintiff asserts that Gillen and the same four Fountain Valley police officers searched his dwelling on February 3, 2000, without reasonable purpose—although one of the conditions of his parole at that time was that he submit to searches at any time and with or without cause—and principally in retaliation for Plaintiff's prior litigation efforts against those four Fountain Valley defendants. Plaintiff's eleventh and twelfth claims accuse Defendants of violating his Fourth and Fourteenth Amendment rights by attaching a "Tele-trac" device to his car on December 1, 1999, to monitor his movements. His thirteenth claim asserts that,

on the same day, Gillen handcuffed him too tightly for too long.

Never targeted for dismissal or summary adjudication are claims 10 and 14, neither of which implicates defendant Gillen. In claim 10, Plaintiff accuses either two or four of the Fountain Valley defendants-it is unclear whether this count targets only Ahlo and Long or if it also targets Farley and McInnis—of violating Plaintiff's right of access to the courts by improperly confiscating materials during their March 2000 search of his residence. In claim 14, Plaintiff asserts that the City of Fountain Valley failed to train the defendant officers adequately, resulting in their wrongful actions in counts 1 through 12.

On January 8, 2002, upon the recommendation of the undersigned, the Court granted in part defendant Gillen's prior dismissal motion. Specifically, the Court dismissed (a) claims 4 and 13, which stemmed from the December 1, 1999, events, as time-barred; and (b) claims 11 and 12, based on use of the Tele-trac device, and claim 8, asserting that the February 3, 2000, search occurred at an unreasonably early hour of the day, as legally insufficient. Hence, in the wake of the Court's January 8, 2002 Order, the following claims remain:

- *all* claims against the Fountain Valley defendants (claims 1–14, except claim 13, the handcuffing claim, which targeted only Gillen); and

- claims 7 and 9 against defendant Gillen. (Claims 1, 2, 3, 5, 6, 10 and 14 do not target Gillen.)

## II.

### THE TWO CURRENT MOTIONS BY DEFENDANTS

On November 8, 2002, the Fountain Valley defendants filed a FED. R. CIV. P.

12(b)(6) motion to dismiss all claims against them except claims 10 and 14. The undersigned, noting that a motion under that rule was untimely, converted that motion to one seeking either judgment on the pleadings under Rule 12(c) or, given the possible need to refer to matters outside the pleadings, summary adjudication under Rule 56.

On November 27, 2002, defendant Gillen filed a motion for summary judgment as to the two remaining claims against him, claims 7 and 9, along with the required Statement of Uncontroverted Facts and Conclusions of Law ("SUP") and other supporting documents. The Fountain Valley defendants filed a joinder in Gillen's motion on December 10, 2002, although they did not add any evidence of their own.

Plaintiff filed several documents in opposition to the motions, including multiple declarations, although be never filed a Statement Of Genuine Issues In Dispute "setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated," as he was advised to do in the Court's and Gillen's notices made pursuant to *Rand v. Rowland,* 154 F.3d 952, 960 (9th Cir.1998), and as is required by CIVIL L.R. 56–2. The Local Rules provide that—

> In determining any motion for summary judgment, the Court will assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the "Statement of Genuine Issues" *and* (b) controverted by declaration or other written evidence filed in opposition to the motion.

CIVIL L.R. 56–3 (emphasis added). Notwithstanding this Rule and Plaintiff's failure to provide a Statement of Genuine Issues In Dispute, the Court has considered Plaintiff's declarations and other submissions in opposition to the motions.

## III.

## ANALYSIS

### A. Standards of Proof

Although Gillen seeks only summary judgment under FED. R. CIV. P. 56, the Court has converted the Fountain Valley defendants' motion to one seeking either summary judgment *or* judgment on the pleadings under FED. R. CIV. P. 12(c). Accordingly, the Court reviews the standard of proof for both kinds of motions.

### 1. Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Normally, judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1550 (9th Cir. 1989). However, if a motion for judgment on the pleadings is used to raise the defense of failure to state a claim, then the motion faces the same test as a motion brought under Rule 12(b)(6): judgment may be granted to the defendant only if it is clear that no relief could be granted to the plaintiff under any set of facts that could be proven consistent with the allegations. *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 810 (9th Cir.1988). Under either standard, the allegations of the nonmoving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false. *Hal Roach,* 896 F.2d at 1550.

## 2. Summary Judgment

In contrast, summary judgment motions test the evidence, not the pleadings. Such motions should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial responsibility of showing there is no genuine issue for trial, before the nonmoving party must introduce evidence. But the moving party is not initially required to *introduce evidence* negating an element on which the nonmoving party will bear the burden of proof at trial (although the moving party may, and often does, do so). Rather, the moving party need only point out to the Court that, on at least one such element, no evidence supports non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnett v. Centoni*, 31 F.3d 813, 815 (9th Cir.1994). Thereafter, the nonmoving party may not rest upon the mere allegations or denials of his pleading but rather must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Any inferences drawn from the evidence presented will be viewed in a light most favorable to the nonmoving party. *See id.* at 254, 106 S.Ct. 2505. *Pro se* pleadings must be liberally construed, moreover, because the "court recognizes that it has a duty to ensure that *pro se* litigants do not lose their right to a hearing on the merits due to ignorance of technical procedural requirements." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1990). On December 16, 2002, the Court informed the plaintiff, as required by *Rand v. Row-*

*land, supra,* of the requirements for responding to the motion for summary judgment, including the following warning against a failure to respond or an insufficient response, derived from FED. R. CIV. P. 56(e):

> [T]he plaintiff may not rest on the mere allegations in his complaint. The plaintiff's opposition must include admissible evidence demonstrating that a genuine dispute exists concerning a fact material to the case. The opposition may include sworn affidavits (or declarations under penalty of perjury) setting forth specific facts material to the case.... The plaintiff's opposition may also include other admissible documentary evidence.
>
> The plaintiff is warned that, if he fails to submit admissible evidence contradicting the defendants' version of the facts, the Court may accept the defendants' version of the facts as the truth. If the Court accepts the defendants' version of the fact as the truth, the Court may grant the defendants' motion and enter final judgment against the plaintiff without any trial.

Defendants previously had sent Plaintiff a substantially similar "Notice Under *Rand v. Rowland*" on November 27, 2002.

## B. Gillen's Summary Judgment Motion

### 1. Unreasonable Search Claim (Claim 7)

█ Authorities do not violate a parolee's Fourth Amendment rights by conducting a warrantless search, so long as they have a "reasonable suspicion" that the parolee is engaged in criminal activity. In such settings, authorities are not required to clear the higher "probable cause" hurdle that generally applies to requests for search warrants. *United States v. Knights*, 534 U.S. 112, 121, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (*following Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164,

97 L.Ed.2d 709 (1987)). In *Knights,* although the parolee-petitioner, like Petitioner Mark Wilson here, had agreed to a California parole condition whereby he consented to searches at any time "without a search warrant, warrant of arrest or reasonable cause," and although the *Knights* court acknowledged that "the terms of the probation condition permit such a [suspicionless] search," the high court expressly declined to decide whether a search undertaken *without* reasonable suspicion could violate the parolee's rights. 534 U.S. at 119–20 & n. 6, 122 S.Ct. 587.

After *Knights,* the Ninth Circuit held in *United States v. Crawford,* 323 F.3d 700 (9th Cir.2003), *vacated and en banc rehearing granted,* 343 F.3d 961 (9th Cir. 2003), that authorities violated the Fourth Amendment when they searched parolee Raphyal Crawford without reasonable suspicion—even though Crawford, like Petitioner and Mark Knights, had agreed to a parole condition authorizing searches at any time, "with or without cause." 323 F.3d at 702. (Although the Ninth Circuit's order granting *en banc* rehearing in *Crawford* vacated the initial panel's decision in the case, and rendered it not citeable as precedent, the undersigned discusses the panel's two opinions as a means of illustrating two principal contending views of the underlying issue.) *Crawford's* majority rejected the view that the Constitution and *Knights* did not forbid suspicionless searches, so long as the searches did not sink to the level of "arbitrary, capricious or harassing." In contrast, Circuit Judge Trott wrote in dissent that non-harassing yet suspicionless searches of a parolee are "reasonable under the totality of the circumstances," where a key circumstance was the parole condition whereby the parolee had consented to suspicionless searches. *See id.* at 723–738 (Trott, Circuit J., dissenting). A parolee's criminal history forms part of the "totality of the circumstances" that authorities properly may consider in deciding whether to search that parolee. *See Knights, supra,* 534 U.S. at 121, 122 S.Ct. 587.

■ Here, the Court finds that Gillen has satisfied his initial burden of demonstrating the absence of a genuine dispute as to a material fact, *see Celotex, supra,* 477 U.S. at 323, 106 S.Ct. 2548, by introducing evidence supporting a finding that, in searching Plaintiff's residence on February 3, 2000, he had a reasonable suspicion that Plaintiff was engaged in criminal activity. *See Knights,* 534 U.S. at 121, 122 S.Ct. 587; *United States v. Thompson,* 282 F.3d 673, 678 (9th Cir.2002) (explaining that reasonable suspicion "is formed by specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person ... is engaged in criminal activity") (citation omitted). For example, Gillen cites evidence that:

- Plaintiff was convicted in 1991 of oral copulation with a minor (CAL. PENAL CODE § 288(a)(1)). The presentencing report in that case, which Gillen and other Defendants viewed prior to their February 3, 2000, search of Plaintiff's home, indicated that Plaintiff had gone to the home of his sixteen-year-old victim and taken her in his car, where the crime occurred. SUF ¶ 1; Exs. 1–2; *see also* SUF ¶ 20 (Gillen's review of Plaintiff's file prior to Feb. 3, 2000 search). As a result of this conviction, Plaintiff continues to be required to register as a sex offender under CAL. PENAL CODE § 290. SUF ¶ 4; Ex. 7.

- Prior to the 1991 conviction, police had received complaints that Plaintiff had been stalking other women. SUF ¶ 2; Ex. 2.

- Only a few days after his 1992 release on parole, Plaintiff's parole agency reported that he was in possession of not only a newspaper clipping with a pho-

tograph of a juvenile female and an article about her, but also notes on how to stalk the girl—and notes, with phone numbers, about other females. These facts, a Parole Outpatient Clinic doctor believed, indicated Plaintiff was a risk to young females, SUF ¶ 6; Ex. 7.

- In May 1992, the mother of a young female reported to police that Plaintiff had left a note on the car her daughter used, twice had followed her daughter in his vehicle as she drove home, and had called her daughter at home, repeatedly asking the daughter out on a date and telling her he had something to give her. SUF ¶ 7; Ex. 7.

- Plaintiff was repeatedly paroled, and repeatedly reimprisoned for violating his parole, on other occasions daring the 1990's. SUF ¶¶ 8–14.

- Plaintiff was paroled again on August 10, 1999. One of the conditions of his parole, included in the form Plaintiff signed, stated that he agreed to a search of himself or his residence without a warrant "and with or without cause." SUF ¶¶ 16, 17; Ex. 14.

- On November 24, 1999, police received a report from Sandra Ellison complaining that Plaintiff was stalking her; she completed a corresponding crime report on November 30, 1999. The police were aware of Plaintiff's status as a paroled registered sex offender and believed that the complaint was consistent with Plaintiff's prior pattern of conduct. SUF ¶¶ 19–20; Exs. 16, 17.

- On December 1, 1999, police followed Plaintiff's car to see whether be was stalking Sandra Ellison. Although Ms. Ellison resided in a neighborhood that was "off the beaten path" between Plaintiff's residence and his employment location, Plaintiff nevertheless drove through Ms. Ellison's neighbor-

hood twice before heading to work. He was arrested and his residence searched, but police discovered no evidence of Plaintiff's having contact with Ms. Ellison. SUF ¶¶ 21–24; Exs. 10, 16, 17.

- On January 3, 2000, police obtained a 30–day warrant to "hard-wire" Plaintiff's car surreptitiously with a remote tracking device or "Tele-trac." On February 3, 2000, the warrant had expired, and police were required to remove the device. Defendants thus went to Plaintiff's home, where the car was located. Although Plaintiff was not arrested on that date, evidence that police discovered in searching Plaintiff's home led the Board of Prison Terms to revoke Plaintiff's parole on March 29, 2000. SUF ¶¶ 31–44, 46, 47, 49, 53.

From such evidence, a finder of fact reasonably could conclude that Gillen had a reasonable suspicion that plaintiff was involved in criminal conduct, such as stalking Ms. Ellison or other potential victims. *See* CAL. PENAL CODE § 646.9. Gillen's submissions demonstrate an absence of evidence of unreasonableness, an element on which Plaintiff will have the burden of proof at trial. *Celotex, supra,* 477 U.S. at 323, 106 S.Ct. 2548. Accordingly, the burden shifts to Plaintiff to "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

Plaintiff argues that Gillen's asserted reasons for the February 3, 2000, search, "albeit plausible," are "manufactured," PL's Supp. Opp. at 6, but his supporting evidence is lacking. As noted above, he did not file the required Statement of Genuine Issues in Dispute. *See* Civil L.R. 56–2, 56–3. He did, however, submit three declarations opposing the motion, one each on December 18, 2002, on January 3, 2003, and, under the caption of an Ex Parte

Application For Stay of Proceedings, on February 3, 2003. He also obtained leave of Court to file a Supplemental Opposition on March 27, 2003.

The Court has reviewed Plaintiff's submissions for admissible evidence that might gainsay Gillen's evidence and raise a genuine issue of material fact for a jury, but those submissions do not aid Plaintiff substantially. Plaintiff never does more than state unsupported conclusions, such as the following:

> Defendant [Gillen]'s motive and true reasons for conducting the search of Plaintiff's residence remains [sic] in dispute.
>
> . . .
>
> Since Defendant [Gillen] teamed up with [the Fountain Valley Police Department] for the search, he knew or should have known Plaintiff had sued that department previously and [that] they were searching Plaintiff in retribution.

PL's Decl. in Opp. (filed Dec. 18, 2002) ¶¶ 2. 5. These are allegations, not evidence. Plaintiff's declarations reveal no foundation, based upon personal knowledge, for his conclusions. They thus provide no admissible evidence from which a reasonable juror could conclude that the search was undertaken with no reasonable suspicion. Without any "unreasonableness" evidence to counter Gillen's submissions, Plaintiff cannot establish his unreasonable search claim, and no factual dispute exists to be tried.

### 2. Retaliatory Search Claim (Claim 9)

In the other remaining claim against Gillen, Plaintiff asserts that the moving force behind the February 3, 2000, search was the urge to strike back at him for his prior litigation efforts against the Fountain Valley Police defendants. Gillen's evidence indicates otherwise, and Plaintiff has provided no contrary evidence to save this claim.

### a. Legal Standard: 3–Step Analysis

■ Retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983 even if the act, when taken for different reasons, would have been proper. *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Retaliation claims proceed in three analytical steps.

### i. Steps 1 & 2: Protected Conduct and Adverse Action

■ First, as a threshold matter, the plaintiff must prove that the conduct that allegedly prompted the defendants to retaliate was itself constitutionally protected. *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir.2001); *Thaddeus–X v. Blatter,* 175 F.3d 378, 389 (6th Cir.1999) (*en banc* ); *cf. Mt. Healthy,* 429 U.S. at 283–84, 97 S.Ct. 568. Second, the plaintiff must show that the defendants took some "adverse action" against him. *Rauser,* 241 F.3d at 333; *Allah v. Seiverling,* 229 F.3d 220, 224–25 (3d Cir.2000). Here, Defendants apparently do not dispute these first two elements. Plaintiff filed a claim for damages on February 2, 2000, citing misconduct by Officers Simko, Farley, Ahlo and Long on December 1, 1999, and he also had "instituted litigation against F.V.P.D. [the Fountain Valley Police Department] from 1995 to 1999." [1] On February 3, 2000,

---

**1.** As the undersigned observed in the First Report,

> The plaintiff specifically pleads in Claim Nine that the February 3, 2000 search was conducted in retaliation for his filing legal claims against FVPD officers between 1995

and 1999. (Plaintiff may have intended to include the February 2, 2000 legal action against FVPD as well. Plaintiff suggests this intention in his complaint. but he did not state so specifically.)

First Interim R & R at 14.

those Officers and Defendant Gillen searched Plaintiff's residence. *See* Compl. ¶¶ 34–35, 40; *cf. Hines v. Gomez,* 108 F.3d 265, 269 (9th Cir.1997) (noting prisoner's First Amendment right to file grievance claims without fear of retaliation).

### ii. Step 3: Proving Causation, and Burden–Shifting

Causation is the third analytical step. In *Mt. Healthy,* the Supreme Court established a burden-shifting approach to causation, whereby plaintiff bears the initial burden of proving that his constitutionally protected conduct was at least a "substantial or motivating factor" in the defendants' decision to take their adverse action. *See* 429 U.S. at 287, 97 S.Ct. 568. The burden then shifts to defendants to prove, by a preponderance of the evidence, that they properly would have performed the challenged action anyway, *i.e.,* even if the plaintiff had not engaged in constitutionally protected conduct. *See id.*

The Ninth Circuit employs a modified version of *Mt. Healthy's* burden-shifting analytical approach to claims by prisoners against prison officials. In such cases, the plaintiff "bears the burden of pleading and proving the absence of legitimate penological goals for the conduct of which he complains." *Bruce v. Ylst,* 351 F.3d 1283 (9th Cir.2003) (*quoting Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir.1995)). After all, if no legitimate goal underlay the adverse action, then one reasonably may infer that the goal was retaliation. If the plaintiff meets this burden, then the burden shifts to the prison-official defendants to show by a preponderance of the evidence that the allegedly retaliatory action was narrowly tailored to serve a legitimate penological purpose, such as maintaining prison discipline and suppressing criminal activities by inmates. *See Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447(1979); *Bruce,* 351 F.3d at 1288; *Schroeder v. McDonald,* 55 F.3d 454, 461–62 (9th Cir.

1995); *see also Pratt,* 65 F.3d at 806; *Barnett v. Centoni, supra,* 31 F.3d at 816; *Rizzo v. Dawson,* 778 F.2d 527, 532 (9th Cir.1985). This is the equivalent of the final *Mt. Healthy* analytical step, in which defendants seek to show that they would have acted in the same manner even if the plaintiff had not engaged in protected conduct.

In sum, Plaintiff must prove the following elements in support of Claim 9:

1. He took a constitutionally-protected action;

2. Defendants thereafter took adverse action against Plaintiff; and

3. Defendants did not intend to advance any legitimate goal.

If Plaintiff does so, Defendants may seek to show by a preponderance of the evidence that their adverse action was, in fact, narrowly tailored in the pursuit of a legitimate objective.

### iii. Clarifying the First Amended Report as to Causation

▮ Previously, in the First Amended Report And Recommendation accepted early in 2002 by the Court, the undersigned indicated that, as argued by Defendant Gillen and as part of the causation element, Plaintiff should be required to prove that the defendants' search on February 3, 2000, did not "advance any legitimate penological goals." *See* First Interim R & R at 13–14. The undersigned now reconsiders that decision in three respects, but ultimately reaffirms it—albeit with some points of clarification

### (A) Omission of final *Mt. Healthy* analytical step

First, the First Interim Report did not include the final *Mt. Healthy* analytical step. That is, it did not indicate that after a prisoner-plaintiff—including parolees

like Plaintiff, as explained further in the section immediately below—satisfies his burden of showing that defendants' action had no legitimate penological purpose, the burden shifts to defendants to show that their "adverse action" was narrowly tailored to serve legitimate penological goals.

### (B) Do the Cases Involving Prisoners Suing Their Jailors Apply Here, Even Though Plaintiff Was a Non-incarcerated Parolee When Searched?

Second, the undersigned did not discuss a potential distinction in the law governing prisoners' claims against prison officials and that concerning a parolee's claim against non-prison law enforcement officers. "Although Plaintiff is a parolee and not a prisoner," Gillen explained,

> analyzing his retaliation claim under the laws pertaining to prisoners is appropriate here[,] [because] [p]arolees and prisoners are both offenders; the only pertinent difference between them is in the "form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty." *Griffin v. Wisconsin*, 483 U.S. 868[, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709] (1987). "[Parole] is simply one point ... on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." *Id.* at 874[, 107 S.Ct. 3164]. ["]Case law on retaliation claims differentiates prisoners and non-prisoners *but does not sufficiently distinguish retaliatory claims made by parolees or probationers.*["]

SUF at 19 (¶ 8 of Conclusions of Law) (*quoting* First Interim R & R at 13) (emphasis added). The undersigned continues to believe that the state of the law today, like the state of the law on February 3, 2000, supports applying such a test when a parolee sues law enforcement officials for engaging in a retaliatory search. A re-

spectable contrary argument exists, however, that application of this test should be limited to claims alleging retaliation against *physically incarcerated* plaintiffs.

This alternative argument derives support from the initial Ninth Circuit case applying the altered test to prisoners' claims, *Pratt, supra,* and from the Supreme Court case that spurred the *Pratt* panel to do so, *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The appellate court in *Pratt*—a case involving a prisoner's claim that he had been transferred and double-celled for retaliatory reasons—explained as follows:

> *Sandin* involved a Hawaii state prisoner[,][Conner,] who claimed that his procedural due process rights had been violated by the state's refusal to allow him to call certain witnesses at a disciplinary hearing. Following a well-established line of cases, the Ninth Circuit held that Hawaii prison regulations created a protected liberty interest in remaining free of disciplinary segregation and that there was a disputed issue of fact as to whether the procedural safeguards afforded Conner had been sufficient. *Conner v. Sakai,* 15 F.3d 1463, 1466–68 (9th Cir.1993) .... *rev'd,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).
>
> *Sandin* did not involve the same type of claim as that raised in the present appeal. Instead, Conner relied on a line of cases based on *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), in which courts examined prison regulations [and decided that] regulations which used "language of an unmistakably mandatory character," *id.* at 471–72, 103 S.Ct. 864, created liberty interests subject to the protections of the Due Process Clause, whereas those phrased in less "mandatory" language were not. *Sandin* abandoned this meth-

odology, finding it unwieldy and inappropriate. *Sandin,* 515 U.S. at 483–84 & n. 5, 115 S.Ct. 2293.

... *Sandin* contains strong language suggesting the Court's desire to avoid excessive federal judicial involvement in prison administration. The Court noted in particular "the view expressed in several of our cases that federal courts aught to afford appropriate deference and flexibility to state officials trying to manage a volatile environment," especially with regard to "the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims" under § 1983.

. . .

[In light of *Sandin,* we conclude that our retaliation claims analysis] should "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons alleged to be retaliatory."

65 F.3d at 806–07. Portions of *Sandin* suggest that the rationale for that decision, and hence largely for *Pratt* too, was peculiarly focused on managing prison institutions, where many prisoners are housed together and where prisoner discipline is key to preventing an already "volatile environment" from exploding into violence. All of the numerous eases cited by the *Sandin* majority were initiated by plaintiffs claiming mistreatment *while physically incarcerated;* none appears to involve parole or probation. *See* 515 U.S. at 482–84, 115 S.Ct. 2293.. From these observations, one might argue that *Pratt's* explication of the basic *Mt. Healthy* approach—requiring plaintiff to prove that the defendants' actions lacked a legitimate penological purpose—applies *only* to claims arising in such an institutional environment, and, hence, that it does not apply to claims arising when the plaintiff is on parole or otherwise physically at liberty, as Plaintiff was in February 2000. No similarly "volatile environment" exists outside of an insti-

tutional setting, when a parolee-plaintiff is residing in a place of his own choosing, and the authorities' legitimate need to maintain the tightest disciplinary control over a parolee is correspondingly lessened.

Notwithstanding this alternative argument, no case appears yet to have decided whether claims by parolees are or are not required to prove that an allegedly retaliatory act by authorities was not motivated by a legitimate penological purpose (or that the act was not narrowly tailored to such a purpose). Moreover, although parole does not occur in the "volatile environment" of a penitentiary, the supervision of parolees nevertheless implicates many other concerns mentioned in *Sandin.* For example, parolees and the state and local officials who supervise them are subject to a complex array of regulations, not unlike prisoners and their guards. Thus, one can reasonably view *Sandin* as counseling not only against excessive "involvement of federal courts in the day-to-day management of *prisons*" but also against such involvement in the management of no less highly-regulated *parole* programs, parole being a portion of punishment for criminal activity. As *Griffin, supra,* suggests, much of the law regards parole as legally equivalent to physical confinement, and parolees are still considered to be "in custody" for such purposes as invoking habeas corpus jurisdiction under 28 U.S.C. § 2254.

**(C) Must Plaintiff Prove that Defendants' Acts Did Not *Advance* Proper Goals, or that Defendants Did Not *Intend* to Advance Such Goals?**

Third and finally, the First Interim Report left unclear whether the proper test for retaliation is one based (1) on the *results* of defendants' actions or (2) on the *intent* underlying them, *see* First Interim R & R at 13, 14, perhaps because Ninth Circuit precedent includes language sup-

porting both views. In a recent example of the first, results-oriented language, the appellate court in *Bruce v. Ylst, supra,* stated that a prisoner-plaintiff bore the burden of proving, among other things, "that the [defendants'] retaliatory action does not advance legitimate penological goals . . . ." 351 F.3d at 1288 (*quoting Barnett v. Centoni, supra,* 31 F.3d at 816 (in turn citing *Rizzo, supra,* 778 F.2d at 532)). The second version of the test uses language focusing on defendants' subjective motivation. *See Pratt, supra,* 65 F.3d at 806 (plaintiff bears burden of pleading and proving retaliatory motive). The undersigned believes that the proper test is the second one, the to serious shortcomings in the first.

The problem with the first, result-oriented version of the test is that it could permit a lucky defendant to elude liability despite his having committed the very sort of retaliatory acts that the *Mt. Healthy* doctrine clearly intended to deter. Under the results-oriented test, any defendant in a retaliatory search claim whose search yielded any material incriminating the plaintiff could argue that his search *did* "advance legitimate penological goals," even if the search plainly was motivated by retaliatory malice, not a desire to advance legitimate ends.

*Mt. Healthy* and its progeny do not properly immunize defendants who abuse state authority by engaging in a retaliatory act, yet who, in the course of that act, happen to discover evidence incriminating the plaintiff. Accordingly, plaintiff's proper burden at this juncture is to come forward with some evidence, sufficient to support a jury finding. that defendants did not *intend,* in their February 3, 2000, search of his residence, to advance legitimate penological goals—even if the search nevertheless happened to advance such goals.

In sum, although the issue is more complex than previously suggested, the undersigned's prior view of the governing law remains largely unchanged: parolees like Plaintiff are required to prove that defendants' allegedly retaliatory acts were not intended to advance a legitimate penological goal.

### b. Evidence

■ Gillen has submitted numerous items of evidence indicating that the search was undertaken with a reasonable suspicion that Plaintiff was engaged in criminal conduct, as listed above in section III.B.1 of this Report and in Defendant Gillen's sworn declaration. Gillen details his investigation of Plaintiff in late 1999 and testifies that, on February 3, 2000, be received a telephone call from. Fountain Valley police, informing him of their "ongoing investigation that Plaintiff was stalking women." The police requested Gillen's assistance in visiting Plaintiff's residence, he testifies, "because the Fountain Valley Police Department had expressed a preference for working with me based on their belief that Plaintiff's assigned parole agent . . . had informed Plaintiff that he was being investigated prior to the December 1, 1999 search, so [that] when [that] search occurred, Plaintiff had been able to dispose of any evidence relating to the stalking victim Sandra Ellison." Gillen Decl. (Ex. 17 to Mtn.) ¶ 11–12. Gillen states order penalty of perjury that his participation in the search on February 3, 2000, was not undertaken to retaliate against Plaintiff for his legal actions or grievances. *Id.* ¶ 24. (The record is silent as to whether, at the time Gillen joined the other defendants in the February 3, 2000, search, he was even aware that Plaintiff had filed a claim against the other defendants on February 2.) Gillen's submissions demonstrate that evidence of a retaliatory purpose is absent, the first step in the causation element of this claim on which Plaintiff will have the burden of proof at trial. *Celotex, supra,*

477 U.S. at 323, 106 S.Ct. 2548. Accordingly, the burden shifts to Plaintiff to "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(c); *see Barnett, supra*, 31 F.3d at 816 (affirming district court's grant of summary judgment on retaliation claim, where defendants had submitted "some evidence"—including affidavit attesting to non-retaliatory motive, plus a confidential report substantiating prisoner-plaintiff's membership in forbidden racial gang-of non-retaliatory basis for prisoner's restrictive reclassification of prisoner-plaintiff).

Plaintiff again fails to satisfy that burden. It is true that the close proximity in timing between (a) Plaintiff's then most recent litigation effort, namely his claim filed on February 2, 2000, against four of the Fountain Valley police defendants, and (b) the February 3, 2000, search by those defendants and Defendant Gillen, supports an inference that Defendants acted out of retaliation. But the available authority dictates that such timing alone, though possibly sufficient to establish a *prima facie* case for retaliation, will not suffice—unless, perhaps, it is "unusually suggestive" of retaliatory motive—to defeat a motion for summary judgment, once the defendants have submitted evidence that their adverse action against the plaintiff was intended to serve legitimate, non-retaliatory ends. *See Pratt, supra*, 65 F.3d at 808 (rejecting, for lack of evidentiary support, district court's finding that timing of prisoner-plaintiff's inter-prison transfer proved retaliatory motive) ("True, timing can properly be considered as circumstantial evidence of retaliatory intent. In this particular case, however, there is little else to support the inference.") (citation omitted); *Brown v. Coughlin*, 965 F.Supp. 401, 406 (W.D.N.Y.1997) (collecting cases, in prisoner-retaliation context and others, rejecting "timing alone" as sufficient to defeat summary judgment where defendant has evidenced non-retaliatory basis for ad-

verse action); *cf. Estate of Smith v. Marasco*, 318 F.3d 497, 512–513 (3d Cir.2003) (affirming grant of summary judgment rejecting retaliation claim estate of criminal suspect, Smith, who suffered heart attack in confrontation with police) ("Even if timing alone could ever be sufficient to establish a causal link, ... [it] must be 'unusually suggestive' before a causal link will be inferred.") (*quoting Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997); *Nieves v. Board of Education*, 297 F.3d 690, 694 (7th Cir.2002)) (affirming grant of summary judgment rejecting public employee's claim of retaliatory discharge in violation of First Amendment) (similar) ("Nieves has presented no other evidence to connect the timing of the [adverse] decision to her protected expression."); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir.1986) (holding, in private-sector employee's action for discharge in retaliation for protected free speech, that employee may not "rely on the proximity in time between the protected activity and the adverse employment action to create a triable issue of fact after the employer has offered legitimate reasons for its actions").

Here, no evidence other than timing supports Plaintiff's assertion that Defendants, in conducting the February 2000 search, did not intend to advance legitimate penological goals. Nor is the timing in this case "unusually suggestive." Indeed, the fact that Plaintiff had litigated multiple claims against some of the defendants, for several years prior to February 2000, weakens the persuasive impact of the search's timing. *See Estate of Smith, supra*, 318 F.3d at 512–13 ("Smith lodged all his complaints between 1991 and 1998, so ... the timing of the alleged retaliatory action, which started on July 10, 1999, is not unusually suggestive of retaliatory motive."). Once again, therefore, there is no

factual dispute for a jury to resolve. Gillen's motion should be granted.

## C. The Fountain Valley Defendants' Motion—and Their Joinder in Gillen's

The Court may dispose of the claims targeted in the Fountain Valley defendants' motion under Rule 12(c), without need for analysis under Rule 56. (As noted in section D below, however, Rule 56 analysis obviously applies to the Fountain Valley defendants' *joinder* in Gillen's summary judgment motion targeting claims 7 and 9.)

### 1. Claims 1, 2, 3, 4, 5 and 6 Are Time–Barred

The Fountain Valley defendants assert that the first six claims are stale. (For Rule 12(c) purposes, the Court assumes the facts pleaded in the Complaint are true.) They are correct and should be granted judgment on the pleadings as to those counts.

 Because 42 U.S.C. § 1983 does not contain its own statute of limitations, a federal court must borrow the statute of limitations applicable to personal injury claims in the forum state. *Wilson v. Garcia,* 471 U.S. 261, 279–80, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). At the time of the underlying events, and until January 1, 2003, California's limitations period for personal injury claims was one year. CAL CIV. PROC CODE § 340(3) (superseded by § 335.1 in 2003, as discussed further below). A § 1983 claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the claim. *Elliott v. City of Union City,* 25 F.3d 800, 802 (9th Cir.1994); *Cabrera v. City of Huntington Park,* 159 F.3d 374, 379–80 (9th Cir.1998). When a federal court borrows the state statute of limitations, it also borrows the state's tolling rules. *Hardin v. Straub,* 490 U.S. 536, 539, 109 S.Ct.

1998, 104 L.Ed.2d 582 (1989). California has a tolling provision which suspends § 340(3)'s one-year limitations period for plaintiffs who are incarcerated or are in execution under a criminal sentence. *See* CAL. CIV. PROC. CODE § 352.1.

#### a. Claims Arising Out of the March 9, 1999 Incident

Claims 1, 2 and 3 target one of the Fountain Valley defendants, Detective Mike Llorens, for detaining and questioning Plaintiff in a parking lot on March 9, 1999. These claims are time-barred. Any harm to Plaintiff's rights was apparent to him on March 9, 1999. No tolling of the statute appears to have occurred, either for reasons of incarceration or otherwise. Accordingly, Plaintiff had until March 9, 2000, to file suit, but he did not lodge his complaint until January 29, 2001.

#### b. Claims Arising Out of December 1, 1999 Incidents

Claims 4, 5 and 6 arise from events on December 1, 1999. (Specifically, in claim 4, Plaintiff asserts that, along with Gillen, Fountain Valley defendants Long. Farley, Simko and Ahlo arrested Plaintiff at his workplace without reasonable suspicion and in a humiliating manner. In claims 5 and 6, respectively, he alleges that defendants Ahlo and Long failed to release him in a timely manner and that they arrested Plaintiff to retaliate for Plaintiff's recently-concluded litigation efforts against them.) As the Court previously observed in granting Gillen's dismissal motion as to claim 4:

Plaintiff knew of the injuries he is claiming on December 1, 1999 when the arrest occurred, activating the statute of limitations clock on that day. The plaintiff alleges that he was incarcerated for twenty-four days as a result of the December 1, 1999 arrest. Allowing for the twenty-four tolled days, the last day for

the plaintiff to file under the statute of limitations was December 26, 2000. The plaintiff lodged his complaint on January 29, 2001. The complaint was then stamped "filed" on February 8, 2001. Thus, the plaintiff filed these claims more than a month too late.

First Interim R & R at 4. Claims 1 though 6 against the Fountain Valley defendants are no different.

### c. The State's New 2–year Limitations Period Does Not Apply

■ On January 1, 2003, nearly two years after Plaintiff filed the complaint initiating this action, California Code of Civil Procedure § 335.1 became law. The new section extends the prior limitations period applicable to personal injury actions (and therefore presumably to federal civil rights claims, *see Wilson v. Garcia,* 471 U.S. 261, 271–72, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)) of one year under § 340(3) to two years. *See* CAL. CIV. PROC. CODE § 335.1; Cal. Senate Bill 688 (Burton), Stats.2002, ch. 448, § 3. Having concluded, in the immediately-preceding two sections, that Plaintiff's federal claims are stale under the one-year rule, the undersigned must consider whether the intervening extension of the limitations period rescues those claims.

It does not. "It is the general rule that subsequent extensions of a statutory limitation period will not revive a claim previously barred. *James v. Continental Insurance Co.,* 424 F.2d 1064, 1065–66 (3d Cir.1970). But the question is one of legislative intent . . . ." *Davis v. Valley Distrib. Co.,* 522 F.2d 827, 830 (9th Cir.1975). In *Davis,* the Ninth Circuit concluded that, because Congress *did* intend for the particular extension involved in that case to operate retroactively, Davis's claims were the exceptional sort that would be rescued by the extension.

By contrast, however, nothing in the legislation extending California's personal-injury limitations period suggests that the California Legislaturé intended § 335.1 to apply retroactively, except to claims made by victims of terrorist actions on September 11, 2001. *See* Senate Bill 688, sections (c) & (d). Plaintiff does not fall within this narrow exception. Accordingly, the general rule applies, and the undersigned's foregoing analysis remains unchanged: the Court should grant the Fountain Valley defendants judgment on the pleadings on counts 1 through 6.

### D. The Fountain Valley Defendants Should Be Granted Summary Judgment on Claim 7 and Claim 9

That leaves the following four claims in this action, all against the Fountain Valley defendants: claims 7 and 9, which target Defendants Simko. Farley, Ahlo and Long; claim 10, which targets Ahlo and Long, and perhaps Farley and McInnis; and claim 14, which asserts the City of Fountain Valley is liable for negligently training the officers involved in claims 1–12. No one has moved for dismissal of claims 10 and 14. The Court already has concluded that claims 7 and 9 are adequately pleaded, as stated in the First Interim Report And Recommendation. *See* First Interim R & R at 7–14. Accordingly, the Fountain Valley defendants cannot win judgment on the pleadings as to those claims, but they may be able to win their motion under the summary judgment standard. They submitted no evidence of their own. They did join Gillen's motion for summary judgment as to claims 7 and 9, however, and therefore the Court must consider whether that evidence supports granting summary judgment to the Fountain Valley defendants, and not just to Gillen, on those claims.

### 1. Claim 7: Defendants All Shared a Reasonable Basis for Search

The complaint alleges, in support of claim 7, that on the day after Plaintiff had

filed a damages claim against four of the Fountain Valley defendants, "these very same defendants, along with Defendant Gillen," searched Plaintiff and his residence. It is true that the Fountain Valley defendants merely joined Gillen's motion for summary judgment and did not introduce any supporting evidence of their own. But *Gillen's* evidentiary submissions—discussed in greater detail in section III.B.I above—demonstrate that, before the February 3, 2000, search, Gillen and the Fountain Valley defendants freely shared information about Plaintiff and his suspected transgressions with each other. *See, e.g.,* SUF ¶ 20 ("On November 29, 1999, [Gillen] was contacted by Detective Ahlo of the Fountain Valley Police Department [about a recent stalking complaint filed against Plaintiff]. [Gillen] reviewed parolee Wilson's file and found that be had a history of sexual assault and prior investigations for stalking.... [With Gillen's supervisor's approval,] the decision was made to surveil [sic] Plaintiff with the assistance of the Fountain Valley Police Department.").

Gillen's submissions, joined by the Fountain Valley defendants, thus satisfy the Fountain Valley defendants' initial burden of demonstrating the absence of a genuine dispute as to a material fact, *see Celotex supra,* 477 U.S. at 323, 106 S.Ct. 2548, for they supply evidence that, in searching Plaintiff's residence on February 3, 2000, all of the searching defendants shared a reasonable suspicion that Plaintiff was engaged in criminal activity. *See Knights, supra,* 534 U.S. at 121, 122 S.Ct. 587. As noted above, Plaintiff fails to rise to the challenge by supplying countervailing evidence.

### 2. Claim 9: No Evidence of Retaliatory Motive

To satisfy the initial *Celotex* test for claim 9 (retaliatory search) and shift the burden of producing evidence to Plaintiff, the Fountain Valley defendants must show, through evidence or otherwise, that no evidence supports at least one element on which Plaintiff will bear the burden of proof at trial. As discussed above in relation to Gillen's motion for summary judgment as to this claim, the causation element of a retaliation claim places the burden on the plaintiff to show that the defendants' allegedly retaliatory acts were not intended to advance a legitimate penological goal.

Plaintiff has offered no evidence of retaliatory motive other than the timing of the search, which occurred one day after Plaintiff filed his most recent of several court and administrative claims against one or more of the four Fountain Valley police officers named in claim 9. As noted in section III.B.2.b above, "timing alone" almost never can defeat summary judgment where the moving defendant has put in evidence of non-retaliatory intent, as Gillen did. The Fountain Valley defendants did not introduce such evidence. (Nor can they benefit from Gillen's declaration that *he* acted without any improper motive, for it is possible that the four Fountain Valley officers named in claim 9 acted with improper motive *and* that Gillen did not) Nevertheless, the timing of events in this particular case is still too weak to raise a triable issue of fact for a jury, for (a) there is nothing else to support an inference of retaliatory motive; and (b), as also noted previously in discussing Gillen's motion against claim 9, the persuasive impact is diluted by Plaintiff's several years' worth of claims against some of the defendants *prior* to his February 2, 2000, claim. *See Pratt, supra,* 65 F.3d at 808. In sum, although claim 9 presents a much closer question for the Fountain Valley defendants than it did for Gillen, ultimately the undersigned concludes that summary judgment is proper for all defendants named in that claim.

### E. *Heck v. Humphrey* Does Not Plainly Bar Plaintiff's Claims

In addition to their assertion that Plaintiff cannot show any factual dispute justifying a trial of his claims, Defendants argue (in Gillen's motion, joined by the other defendants) that claims 7 and 9 must fail for two additional reasons: the bar imposed by *Heck v. Humphrey, supra*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and the doctrine of qualified immunity. In *Heck* the Supreme Court held that a prisoner could not bring a federal civil rights action if granting the requested relief necessarily would imply the invalidity of the prisoner's conviction, unless he can show that the underlying conviction has been reversed, expunged or set aside. Defendants argue that *Heck* bars the present action because granting Plaintiff relief necessarily would imply that the February 3, 2000, search was unconstitutional—and, therefore, that the resulting March 2000 parole revocation decision itself was invalid.

█ A parole-revocation decision bars related civil-rights claims in the same manner under *Heck* as does an ordinary criminal conviction. *See Littles v. Board of Pardons, Etc.*, 68 F.3d 122, 123 (5th Cir. 1995); *see also Spencer v. Kemna*, 523 U.S. 1, 19, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (Sonter, J., joined by O'Connor, Ginsburg & Breyer, JJ., concurring with a four-Justice plurality) (assuming, without expressly deciding, that *Heck* applies to parole revocations). Here, it is undisputed that Plaintiff's parole revocation decision has not been reversed or set aside. But for two reasons, the undersigned declines to recommend *Heck* as an additional basis for dismissing Plaintiff's claims.

#### 1. *Spencer's* Impact on Plaintiffs Who No Longer are in Custody

█ First, a complication arises here because Plaintiff already has completed the sentence for the underlying parole violation. It is unclear whether *Heck* bars a non-custodial plaintiff—one to whom habeas corpus is not available because he is no longer "in custody" as required, *see* 28 U.S.C. § 2254—from proceeding with a civil-rights action that, if successful, would imply the invalidity of the conviction (or parole revocation) that underlay his now-completed sentence. Five Supreme Court Justices in *Spencer, supra*, believed that a "convict given a fine alone, or sentenced to a term too short to permit even expeditious litigation without continuances before expiration of the sentence," should not be ineligible for § 1983 relief because his circumstances rendered impossible any successful challenge to his conviction or parole revocation—although this five-Justice view does not have the statute of a *holding*. *See* 523 U.S. at 19–21 & n. *, 118 S.Ct. 978 (Souter, J., joined by O'Connor, Ginsburg & Breyer, JJ., concurring with four-Justice plurality); *id.* at 22–25, 118 S.Ct. 978 (Stevens, J., dissenting) (stating that prisoner's right to seek § 1983 relief, notwithstanding extant conviction, is "perfectly clear" where habeas remedy was unavailable). In *Spencer*, the petitioner's parole was revoked when he had just over one year remaining on the underlying sentence, and the petitioner challenged the revocation in state court. About six months remained by the time he had exhausted his state-court challenges and filed his federal habeas petition. The district court issued no ruling before Petitioner completed that remaining six-month portion of his sentence; shortly thereafter, the court dismissed the petition as moot. *Id.* at 5–6, 118 S.Ct. 978. *Spencer* arguably could be read as requiring an exception to *Heck* when the claimant, despite diligently seeking to exhaust state-court remedies to his conviction or parole-revocation decision, nevertheless runs out of time-due to expiration of his sentence—before the state courts and the federal district court have ruled on his

claims. *See Zupan v. Brown*, 5 F.Supp.2d 792 (N.D.Cal.1998) (citing concurrence of Souter, J., in *Spencer* ) (holding that *Heck* does not bar civil-rights claim relating to parole-revocation decision that resulted in sentence of only six weeks, even though plaintiff no longer was in custody, because sentence was too short to permit him to challenge the decision); *cf. Nonnette v. Small*, 316 F.3d 872, 876–77 (9th Cir.2002) (holding that *Heck* does not bar § 1983 action challenging prison's allegedly baseless administrative segregation of, and stripping of good-time credits from, plaintiff, because plaintiff had been paroled and was unable to seek habeas relief or other means to reverse underlying disciplinary actions).

Here, the facts are no clearer than the law after *Heck* and *Spencer*. Specifically, it is unclear either (1) that Plaintiff diligently pursued state remedies to challenge the March 2000 decision revoking his parole, or (2) that, even if Plaintiff did (or had done) so, he would have obtained a ruling from this Court before his release in May 2003. Given the state of the law and the facts, the undersigned declines to recommend dismissing the action on the basis of *Heck v. Humphrey*.

### 2. Claim 9 (Retaliation) Does Not Necessarily Implicate the Validity of Plaintiff's Probation Revocation, and *Heck* Thus Cannot Bar It

█ *Heck* bars civil rights actions only to the extent that granting the requested relief necessarily would imply the invalidity of the underlying conviction. But it is possible that a search could be actionably

---

**2.** Of course, it also is possible for a plaintiff to argue that police retaliatorily *framed* him and thereby caused his conviction. If such were Plaintiff Wilson's theory of claim 9, then *Heck* would remain a potential barrier to it, for granting relief then would necessarily imply the invalidity of his probation violation. *See,*

retaliatory without being sufficiently "unreasonable," for Fourth Amendment purposes, as to merit suppression of evidence obtained in the search. Accordingly, claim 9 cannot be barred by *Heck*, for granting relief on that claim would not necessarily imply that Plaintiff's probation revocation—which stemmed from the February 3, 2000, search that is the focus of claim 9—was itself invalid.[2] *See Johnson v. Litscher*, 260 F.3d 826, 831 (7th Cir.2001) (declining to her, under *Heck*, inmate's action against prison officials for retaliatory discipline, where inmate did not assert his innocence on the disciplinary charges but rather alleged that he was being singled out for excessive punishments).

### F. Qualified Immunity

A state actor, such as a law enforcement officer, is entitled to qualified immunity in an action filed under § 1983 if his or her conduct during a criminal investigation either does not violate a federal constitutional right, or the constitutional right was not clearly established on the date of the alleged violation. *Saucier v. Katz*, 533 U.S. 194[, 121 S.Ct. 2151, 150 L.Ed.2d 272] (2001). *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir.2003).

█ As to claims 7 and 9, the undersigned concludes from the foregoing analysis that no defendant's conduct violated the federal constitutional right to be free from unreasonable searches. Moreover, as the Ninth Circuit's split panel and subsequent grant of an *en banc* rehearing in *Crawford, supra,* illustrate, the contours of the constitutional rights that parolees enjoy against unreasonable searches are not

---

*e.g., Jackson–El v. Winsor*, 986 F.Supp. 440, 444 (E.D.Mich.1997) (barring prisoner's claim that a guard retaliated against him for prior litigation by planting a knife in his cell, resulting in his administrative punishment for weapon possession; underlying disciplinary finding had not been set aside).

"clearly established" today, and they were even less clear on the date of the alleged violation—which occurred prior to the Supreme Court's decision in *Knights, supra,* and the Ninth Circuit's *Crawford* decision. An officer in Gillen's position, or in any one of the targeted Fountain Valley defendants' positions, reasonably could have believed on February 3, 2000, that their search of Plaintiff's residence that day was lawful, in the sense that it was not an "unreasonable search" as alleged in claim 7. The same conclusion applies to claim 9's assertion that the search was retaliatory, because the law governing parolee (or prisoner) searches that allegedly are retaliatory is inextricably intertwined with the thicket of law governing the constitutionality of parolee searches generally. For these reasons, Defendants are entitled to qualified immunity as an independent ground for summary judgment on claims 7 and 9.

## IV.

## WHAT ABOUT CLAIMS 10 AND 14

As noted near the outset of this Report, no defendant has sought dismissal of either claim 10 or claim 14. (In claim 10, Plaintiff accuses either two or four of the Fountain Valley defendants—it is unclear whether this count targets only Ahlo and Long or if it also targets Farley and McInnis-of violating Plaintiff's right of access to the courts by improperly confiscating materials during their March 2000 search of his residence. In claim 14, he asserts that the City of Fountain Valley failed to train the defendant officers adequately, resulting in their wrongful actions in counts 1 through 12.) This seems particularly odd in light of the possible shortcomings in the pleading of both claims.

In claim 10, for example, although Plaintiff alleges that at least two of the Fountain Valley defendants *"meant and intended ... to deprive Plaintiff of his rights to* access the courts" by confiscating certain records, Compl. ¶ 45 (emphasis added), he apparently does not allege that the defendants *succeeded* in inflicting any "actual injury" to a non-frivolous habeas or civil rights claims, as the law requires, at least in actions by prisoner-plaintiffs. *Cf. Lewis v. Casey,* 518 U.S. 343, 353–55, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (requiring "actual injury" for denial-of-access-to-courts claims brought by prisoners). Claim 14 may be infirm for two independent reasons. First it asserts that the City is liable, based on, and only based on, the actions of its police officers as described in claims 1 through 12. If the Court dismisses claims I through 9 and 11 through 13 as recommended, and if claim 10 is inadequately pleaded, then no basis remains for sustaining liability against the City for negligent training. Second, claim 14 may be inadequately pleaded, for Plaintiff does not appear to allege that the City's failure to train its officers was so complete as to constitute its "deliberate indifference" to the rights of persons coming into contact with its police officers. *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (rejecting lower standard requiring only "gross negligence" in the defendant city's approach to training).

Whether or not such shortcomings exist, no defendant has brought an appropriate motion to put claim 10 or claim 14 to the test. Time to do so has passed, under the scheduling order which set a cut-off date for motions. Accordingly, the undersigned can only pass those claims on to the District Court for trial or other appropriate disposition.

## V.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the District Court issue an Order:

1198

(1) accepting and adopting this Report;

(2) granting Defendant Gillen's Motion for Summary Judgment in part;

(3) denying Gillen's motion without prejudice in part as to its *Heck v. Humphrey* argument;

(4) granting Gillen's motion, joined by the Fountain Valley defendants, as to qualified immunity against claims 7 and 9;

(5) granting the Fountain Valley defendants' dismissal motion, construed as one for judgment on the pleadings or as one for summary judgment; and

(6) dismissing from this action—

(a) all remaining claims against defendant Gillen (*i.e.*, claims 7 and 9); and

(b) all remaining claims against the Fountain Valley defendants *except* claims 10 and 14.

Dated: January 7, 2004.