**John RAYFORD Plaintiff,**

v.

**Wendall OMURA, in his individual capacity; Elliot Plourde, in his individual capacity; and Does 1–10, Defendants.**

**No. CIV 04–00565JMSBMK.**

United States District Court,
D. Hawai'i.

Nov. 8, 2005.

Jack F. Schweigert, Rory S. Toomey, Honolulu, HI, for Plaintiff.

Susan R. Kern, Heidi M. Rian, Robyn B. Chun, Office of the Attorney General, State of Hawaii, Honolulu, HI, for Defendants.

*ORDER DENYING THE DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT*

SEABRIGHT, District Judge.

### I. *INTRODUCTION*

Defendants Wendall Omura and Elliot Plourde ("the Defendants") have moved the court to dismiss Plaintiff John Rayford's Amended Complaint. In the alternative, the Defendants ask the court to grant summary judgment in their favor. Based on the following, the court DENIES the Defendants' motion.

### II. *BACKGROUND*

Rayford has voiced strong opposition to the policies and practices of Child Protective Services ("CPS"), a branch of the State of Hawaii's Department of Human Services. Rayford claims that Omura and Plourde, social workers with CPS, have taken steps to infringe on Rayford's First Amendment rights.

Honolulu Community Action Program, Inc. ("HCAP") is a non-profit corporation organized to benefit low and moderate-income families and individuals. HCAP's mission is to develop and focus government and private resources towards obtaining opportunities and services necessary for low-income families to become physically, emotionally and economically self-sufficient and self-fulfilled.

Rayford states that he began running advocacy programs for parents involved in HCAP programs beginning in 1975. In June 1995, he moved into office space within HCAP's Leeward District Office in Waianae. Rayford's wife, Danette Rayford, has been the manager of HCAP's Waianae office since 1990. Rayford alleges that Ruby Hargrave, HCAP's then-Executive Director, approved of Rayford's use of the HCAP office space and specifically told Rayford that he could use the office as long as he needed it.

In 2001, Rayford began advocating on behalf of families regarding CPS matters. He contends that he became the resource person for HCAP, accepting referrals from HCAP from individuals who needed assistance in their dealings with CPS. In November 2001, Rayford established the Ha-

waii Family Advocacy Center ("HFAC"), a sole proprietorship, to further his CPS advocacy efforts. Plaintiff operated HFAC out of the HCAP office and was allowed to use HCAP's phone and fax machine. Rayford asserts that he met with approximately nine to twelve people on a weekly basis regarding their problems with CPS, and that approximately 60% of those individuals were referred from HCAP.

On October 25, 2002, Rayford met with Hargrave and Thomas K. Matsuda, HCAP's Community Services Operations Manager. In his declaration, Matsuda stated that, at the October 25 meeting, Rayford wanted permission to use HCAP's premises for advocacy purposes. According to Matsuda, Hargrave advised Rayford at that meeting that HCAP clients would be referred to Rayford as a "resource" person, but that HCAP would not allow the use of its premises for his advocacy. Rayford, on the other hand, contends that he had already been using HCAP property for advocacy purposes for more than one year and was not seeking permission from HCAP to continue his advocacy efforts; instead, he states that the purpose of the meeting was to ensure that all individuals referred to Rayford from HCAP understood that Rayford did not work for HCAP.

In March 2003, Rayford conducted a petition drive, calling for a legislative investigation into CPS, on HCAP property. Omura allegedly called Matsuda to complain about Plaintiff's petition drive on HCAP's property; Matsuda contacted Danette Rayford, who in turn directed the Plaintiff to stop the petitioning. Rayford stopped his petition drive at his wife's direction. Rayford contends that this is the first example of the Defendants' inter-ference with Rayford's First Amendment rights.[1]

According to Rayford, the Defendants again interfered with his First Amendment rights in early 2004. In February 2004, Plaintiff disseminated notice of an upcoming "Family Rights Seminar Tour." The event, scheduled for March 19–21, 2004, was billed as "a very intensive training for *anyone* who may be affected by Child Protective Services Agencies," although representatives of CPS were excluded. A flyer advertising the event indicated that it was co-sponsored by HCAP.

On March 4, 2004, Rayford testified[2] before the State Legislature regarding the problems he believed existed at CPS. On March 15, 2004, Omura (the CPS supervisor for the Waianae District Unit) faxed Matsuda a number of HFAC documents regarding the Family Rights Seminar, including a handout entitled "Child 'Protective' Services People fit the Profile of a Sociopath." Omura noted that Rayford was using HCAP's contact number and fax number on several of HFAC's documents.

On March 23, 2004, Plourde (the case manager of the Kapolei Unit of CPS) called Matsuda and asked him if he was aware of the kind of information that was being distributed by Rayford to clients. Plourde also asked whether Plourde knew that HCAP was listed as a co-sponsor for the Family Rights Seminar.

Matsuda showed the HFAC documents to Robert Piper, HCAP's Chairman of the Board. Piper then recommended that Matsuda ask Rayford to cease and desist using HCAP's facilities, including its e-mail, phone, and fax. In a letter dated April 6, 2004, Hargrave directed Rayford to "immediately cease and desist from con-

---

1. Rayford's First Amended Complaint does not seek relief for this alleged constitutional violation.

2. The record is unclear as to whether Rayford testified in person or simply submitted written testimony.

ducting any CPS advocacy services from any of [HCAP] facilities or premises." Rayford states that he has complied with this directive and that he no longer conducts any advocacy services on HCAP property. On May 18, 2004, he wrote to the HCAP Program Evaluation Committee in an (unsuccessful) effort to re-establish his advocacy services at HCAP.

On September 16, 2004, Rayford brought this action against Omura and Plourde in their individual capacities.[3] He alleges that the Defendants' complaints regarding his use of HCAP's office, which resulted in his being denied the use of HCAP facilities, were retaliatory and chilled Plaintiff's exercise of his First Amendment rights in violation of 42 U.S.C. § 1983. Plaintiff also seeks punitive damages.

The Defendants subsequently filed the instant Motion to Dismiss or for Summary Judgment on May 20, 2005. The Defendants ask the court to dismiss all claims against them because Plaintiff's First Amended Complaint does not allege sufficient facts to state a claim under § 1983. In the alternative, the Defendants argue that they are entitled to summary judgment because 1) the Plaintiff did not have a pre-existing right or permission to advocate on HCAP's private property; 2) the Defendants are entitled to qualified immunity; and 3) the Defendants' complaints to HCAP do not form a basis for punitive damages.

Based on the following, the court denies the Defendants' motion.

## III. *STANDARDS OF REVIEW*

### A. *Motion to Dismiss*

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a motion to dismiss a claim for "failure to state a claim upon which relief can be granted[.]" Fed.

R.Civ.P. 12(b)(6). When reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, a court takes the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir.2001). "Conclusory allegations of law however, are insufficient to defeat a motion to dismiss." *Id.* Under Rule 12(b)(6), a complaint should not be dismissed " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Id.*

### B. *Summary Judgment*

Summary judgment is appropriate when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

The primary purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden initially lies with the moving party to show that there is no genuine issue of material fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir.1987). Nevertheless,

---

**3.** Rayford filed a First Amended Complaint on December 1, 2004.

"summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir.1999) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

## IV. ANALYSIS

Rayford's complaint sets forth the following three claims for relief: (1) the Defendants complained to HCAP regarding Rayford's advocacy, and this complaint was retaliatory and in violation of Rayford's First Amendment rights (thus entitling Rayford to relief pursuant to 42 U.S.C. § 1983); (2) the Defendants' actions chilled Rayford's exercise of his First Amendment rights (thus entitling Rayford to relief pursuant to § 1983); and (3) the Defendants were malicious and/or acted in reckless disregard of Rayford's federally protected rights, thus entitling Rayford to punitive damages.

■ "To sustain an action under § 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right." *Balistreri*, 901 F.2d at 699. The Defendants argue that the court should dismiss this case because Rayford has not alleged facts sufficient to support his three claims for relief. In the alternative, the Defendants argue that they are entitled to summary judgment as to Rayford's first two claims (retaliation and chilling of First Amendment rights) for two reasons: (1) Rayford did not have a right to advocate on HCAP's property prior to the time when Defendants complained about Rayford's behavior; and (2) the Defendants are entitled to qualified immunity. The Defendants also argue that they are entitled to summary judgment as to Rayford's third claim (for punitive damages) because the Defendants' alleged contact with HCAP is too remote to form the basis for punitive damages. Each of these arguments is addressed in turn.

### A. Motion to dismiss

The Defendants contend that Rayford has not alleged facts sufficient to establish that the Defendants violated his constitutional rights, such that the court should dismiss his suit. The court disagrees.

■ As an initial matter, whether Rayford has separate claims for relief based on retaliation and chilling, or whether these two terms ("retaliation" and "chilling") are simply two different ways of proving a § 1983 claim for a First Amendment violation more generally, is not entirely clear. To succeed on his claim that a government official chilled his First Amendment rights, Rayford "must provide evidence showing that [the defendant] 'deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.'" *Menotti v. City of Seattle*, 409 F.3d 1113, 1155 (9th Cir.2005) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir.1994)). Rayford need not provide evidence that *his* speech was chilled, however: "In making their First Amendment claim, the plaintiffs were obligated to prove only that the officials' actions would have chilled or silenced 'a person of ordinary firmness from future First Amendment activities,' not that their speech and petitioning were 'actually inhibited or suppressed.'" *White v. Lee*, 227 F.3d 1214, 1241 (9th Cir.2000) (quoting *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999)).

■ The Ninth Circuit has set forth a slightly different standard for a First Amendment retaliation claim, however. Most retaliation claims arise where there exists an employment or contractual rela-

tionship between the plaintiff and the government official, *see Alpha Energy Savers, Inc. v. Hansen,* 381 F.3d 917 (9th Cir.2004) (government contractor), *Ulrich v. City & County of San Francisco,* 308 F.3d 968 (9th Cir.2002) (government employee), although the Ninth Circuit has permitted retaliation claims where this type of relationship did not exist, *see Mendocino Envtl. Ctr. v. Mendocino County,* 14 F.3d 457, 464 (9th Cir.1994) (environmental protesters). In the typical retaliation case involving a governmental employee or contractor, the plaintiff must demonstrate that "(1) it engaged in expressive conduct that addressed a matter of public concern; (2) the government officials took an adverse action against it; and (3) its expressive conduct was a substantial or motivating factor for the adverse action." *Alpha Energy Savers,* 381 F.3d at 923. *See also Ulrich,* 308 F.3d at 976 (holding that the employee has the "initial burden to demonstrate that (1) he was subjected to an adverse employment action ... (2) he engaged in speech that was constitutionally protected because it touched on a matter of public concern and (3) the protected expression was a substantial motivating factor for the adverse action").

Other circuits have set forth similar tests for non-employee retaliation cases. For example, as *Keenan v. Tejeda,* 290 F.3d 252, 258 (5th Cir.2002), explained:

Unlike most of this circuit's First Amendment retaliation cases, this case does not involve an employment or other contractual relationship between the plaintiffs and the governmental officials. The settled law of other circuits, which we endorse, holds that to establish a First Amendment retaliation claim against an ordinary citizen, [the plaintiffs] must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from con-

tinuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct.

*See also Worrell v. Henry,* 219 F.3d 1197, 1212–13 (10th Cir.2000) (setting forth a nearly identical test in a non-employee retaliation case). The test in retaliation cases is therefore similar to the test discussed *supra* (for a non-retaliation claim) in that both tests require that a government official act and do so with the intention of stifling protected speech.

■ "Retaliation" and "chilling" are simply two different ways of proving a First Amendment violation. The principle underlying both "retaliation" and "chilling" claims is the same: a plaintiff may only recover for a First Amendment violation pursuant to § 1983 where the government has done some harm to the plaintiff. As the Ninth Circuit explained:

Yet even in the field of constitutional torts *de minimis non curat lex.* Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise[.]

*Allen v. Scribner,* 812 F.2d 426, 439 n. 1, *as amended,* 828 F.2d 1445 (9th Cir.1987). *See also Coszalter v. City of Salem,* 320 F.3d 968, 974–75 (9th Cir.2003) ("The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases. The goal is to prevent, or redress, actions by a government employer that 'chill the exercise of protected' First Amendment rights.").

■ More tellingly, *Rhodes v. Robinson,* 408 F.3d 559, 567 n. 11 (9th Cir.2005), suggested that a plaintiff in a retaliation case need demonstrate only that she or he

was harmed by the government's action—and need not demonstrate both actual harm and chilling of future speech—to recover in a § 1983 action:

> If [the plaintiff] had not alleged a chilling effect, perhaps his allegations that he suffered harm would suffice, since harm that is more than minimal will almost always have a chilling effect. *Alleging harm and alleging the chilling effect would seem under the circumstances to be no more than a nicety.* See, e.g., Pratt [*v. Rowland,* 65 F.3d 802, 807 (9th Cir.1995) ] (deciding that alleged harm was enough to ground a First Amendment retaliation claim without independently discussing whether the harm had a chilling effect); *Valandingham v. Bojorquez,* 866 F.2d 1135, 1138 (9th Cir.1989) (same).

(Emphasis added.)[4] In short, § 1983 permits Rayford to recover from the Defendants if the Defendants infringed upon his First Amendment rights regardless of whether Rayford labels the violation as "chilling" or "retaliation." Rayford must prove that the Defendants infringed upon his rights and that the Defendants intended to do so; to prove infringement, Rayford can prove *either* that he was actually harmed by the Defendants' actions *or* that the Defendants' actions would chill a person of ordinary firmness from speaking against the Defendants in the future.

In the instant case, Rayford has set forth sufficient facts to survive the Defendants' motion to dismiss. Each factor—infringement of First Amendment rights and intent to infringe—is discussed in turn.

*1. Whether the Defendants' actions infringed upon Rayford's First Amendment rights*

 The Defendants argue that, while Rayford may have lost his office space, nothing prevents him from continuing his advocacy. Therefore, the Defendants contend, a person of ordinary firmness would not be deterred from future speech as a result of the Defendants' actions. The court disagrees.

First, Rayford has alleged that the Defendants caused him actual harm by evicting Rayford from his office, resulting in his inability to engage in political speech critical of CPS. Thus, pursuant to *Rhodes,* Rayford need not also demonstrate that a person of ordinary firmness would be deterred from speaking out against CPS in the future. Second, even if Rayford had not alleged actual harm, dismissing his Complaint would be improper because Rayford has set forth sufficient facts to allow a jury to conclude that a person of ordinary firmness would be deterred from speaking against the Defendants in the future. Rayford alleges that he *not only* lost access to his office, but that he lost access to his referrals from HCAP. Because he no longer has access to these clients, he contends, his advocacy efforts have been severely curtailed. The court agrees that these allegations, if accepted as true, could demonstrate chilling of a First Amendment right or actual harm under the First Amendment. For example, in *The Chicago Reader v. Sheahan,* 141 F.Supp.2d 1142, 1146 (N.D.Ill.2001), the court concluded that denying a report-

---

**4.** The plaintiff in *Rhodes* was a prisoner, and the Ninth Circuit has set forth a slightly different test in analyzing § 1983 retaliation claims brought by prisoners:

> Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.
>
> *Rhodes,* 408 F.3d at 567–68 (footnote omitted).

er access to incarcerated mothers could chill someone's speech because "[t]he alternative sources defendants offered are not adequate substitutes for first-hand observations." Although the journalist in *Sheahan* was able to continue writing critical newspaper articles, the court concluded that her pieces would not be as effective if she were denied access to the incarcerated mothers. Similarly, in the instant case, Rayford claims that he lost clients and that his future advocacy will be less effective because of his restricted access to potential clients; consequently, Rayford has alleged sufficient facts in support of his § 1983 claim to survive a motion to dismiss.

In sum, taking the allegations in Rayford's complaint as true, the complaint sets forth sufficient facts to support Rayford's claim that the Defendants' actions infringed upon Rayford's First Amendment rights—either because the Defendants' actions caused Rayford actual harm or because those actions chilled future speech.

2. *Whether deterring Rayford's speech was a substantial or motivating factor in the Defendants' actions*

 The Defendants contend that, even if the Plaintiff's allegations are true, the case should be dismissed because Rayford cannot reasonably argue that deterring Rayford's speech was a motivating factor in the Defendants' complaint. The Defendants are incorrect.

As the Ninth Circuit has explained, "[i]ntent to inhibit speech, which is an element of the claim, can be demonstrated either through direct or circumstantial evidence." *Mendocino Envtl. Ctr.*, 192 F.3d at 1300–01 (citation and internal quotation signals omitted). If Rayford is correct in stating that the Defendants complained to HCAP *in order to* have Rayford evicted from his office space, then deterring Rayford's speech *could* be a substantial or

motivating factor in the Defendants' actions. Rayford sets forth sufficient circumstantial evidence to support this claim as well; for example, Rayford points out that Omura sent a fax to Matsuda eleven days after Rayford testified at the State Legislature regarding purported problems with CPS. Rayford contends that the proximity in time between Rayford's speech and Omura's fax is circumstantial evidence of intent. Construing the allegations in the light most favorable to Rayford, as the court must, the court finds that Rayford has set forth sufficient facts to survive a motion to dismiss the § 1983 claims.

B. *Motion for summary judgment*

1. *Rayford's right to be on HCAP property*

 The Defendants argue that they are entitled to summary judgment because HCAP's property is private and is not a public forum. The Defendants contend that Rayford knew that he did not have permission to advocate on HCAP property, and that, prior to Defendants' complaint to HCAP, Rayford knew he did not have such permission to advocate at HCAP. The Defendants' argument appears to be that, because Rayford did not have any right to advocate on HCAP property, he was not injured by the Defendants' alleged complaints to HCAP.

The Defendants' argument is without merit. First, regardless of whether Rayford had a right to be on HCAP property, Rayford claims that he had been working out of an HCAP office without any trouble and that he was ousted from that office as a result of the Defendants' actions. In other words, even if HCAP could have evicted Rayford at any time for any reason, Rayford may be able to demonstrate infringement of his First Amendment rights if he can prove that the Defendants caused him to be evicted (and took such

action because of Rayford's political speech). Second, there is a genuine issue of material fact as to Rayford's right to be on the property, as Rayford claims that Hargrave told him he could use the property as long as he needed it. Consequently, summary judgment is not appropriate.

## 2. *Qualified immunity*

 "[G]overnment officials performing discretionary functions [are entitled to] a qualified immunity, shielding them from civil damage liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The court engages in a two-part inquiry in order to determine whether a defendant is entitled to qualified immunity. The court must first determine whether the facts show that the defendant's conduct violated a constitutional or statutory right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, the court must determine whether the constitutional or statutory right was clearly established at the time the defendant violated the right. *Id.* In reviewing the second part of this inquiry, the court must decide whether a reasonable official would have known that his or her conduct violated the right. *Id.* at 202, 121 S.Ct. 2151. *See also Trevino v. Gates,* 99 F.3d 911, 916 (9th Cir.1996) (explaining that a defendant is entitled to qualified immunity if she can show either that (1) the constitutional right was not clearly established or (2) a reason-

able official would not have known that her conduct violated that right).

Taking Rayford's allegations as true, the Defendants are not entitled to qualified immunity. If Rayford is correct— that is, if the Defendants intended to have Rayford removed from HCAP property to retaliate against him for his advocacy efforts or in an effort to chill his speech— then the Defendants' conduct violated a clearly established constitutional right; furthermore, a reasonable official would have understood that such actions violated Rayford's First Amendment rights. Therefore, the court rejects the Defendants' request for qualified immunity.[5]

## 3. *Punitive damages*

 Punitive damages are available in a § 1983 action only where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Additionally, the Ninth Circuit recently held that a district court erred in failing to instruct a jury in a § 1983 case that "oppressive conduct" can form the basis for an award of punitive damages. *Dang v. Cross,* 422 F.3d 800, 808–09 (9th Cir.2005).

The Defendants argue that Rayford has failed to allege the malicious, wanton or oppressive conduct necessary to support a claim for punitive damages. Nevertheless, as discussed above, there are genuine issues of fact as to the substance of and motivation behind the Defendants' contacts

---

**5.** If the Defendants' version of events were undisputedly true, then the court would not hesitate to grant the Defendants' request for qualified immunity: asking HCAP whether it was indeed a co-sponsor of HFAC's "Family Rights Seminar" would not violate a clearly established constitutional right, and no reasonable official would believe that this type of inquiry would violate a clearly established constitutional right. But Rayford alleges (and provides some supporting evidence) that the Defendants did not contact HCAP merely to inquire as to whether HCAP was a co-sponsor of the "Family Rights Seminar," but rather to have Rayford removed from HCAP property (thereby suppressing his political speech).

with HCAP. Adopting Rayford's version of events as true, a reasonable finder of fact could find that the Defendants acted maliciously, wantonly, or oppressively. Therefore, the Defendants are not entitled to summary judgment on the issue of punitive damages with respect to any claim.

## V. CONCLUSION

For the foregoing reasons, this court DENIES the Defendants' Motion to Dismiss or for Summary Judgment.

IT IS SO ORDERED.